THE NORTH AMERICAN COAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 28278, 38298.   Promulgated August 3, 1933.

*C. F. Taplin*, *Esq.*, and *Leo H. Hoffman*, *Esq.*, for the petitioner.
*A. H. Pierce*, *Esq.*, and *I. M. Tullar*, *Esq.*, for the respondent.

824

OPINION.

MARQUETTE: *Issue (1).*—On the brief, the petitioner concedes that the deficiencies in 1922 and 1923 taxes are not barred by the statute of limitations, if the respondent's notice of March 7, 1928, fulfills all of the requirements of section 274, Revenue Act of 1926. The question of the sufficiency of that notice was decided by the Board in the order entered August 1, 1931; and the conclusions reached in the accompanying memorandum are supported by the circuit court's decision in *Burnet* v. *San Joaquin Fruit & Investment Co.,* 52 Fed. (2d) 123. Under the waivers or consent agreements the time for assessment of any additional taxes found due for 1922 was extended to December 31, 1928. The period of limitation for assessment of any additional taxes found due for 1923 did not expire until March 14, 1928, four years from the date the return was filed. Sec. 250 (d), Revenue Act 1921; sec. 277 (a) (1), Revenue Act 1924; sec. 277 (a) (2), Revenue Act 1926. And as the respondent's notice was mailed within the applicable periods of limitation, assessment of the 1922 and 1923 deficiencies is not barred.

Also, on the brief, the petitioner raises the question of the statute of limitations in respect of the liability asserted against it under section 280 as transferee of the A. J. Morgan Coal Co., for the deficiency in the 1920 taxes of that company. This is a new question raised for the first time on the brief, and, therefore, is not properly before the Board. This Board will not consider issues of fact not pleaded in the original petition or raised by proper amendment thereto. *Dixie Mfg. Co.,* 1 B.T.A. 641; *W. A. Roth,* 4 B.T.A. 834; *H. D. & J. K. Crosswell, Inc.,* 6 B.T.A. 1315; *S. L. Fowler,* 6 B.T.A. 250; *D. N. & E. Walter & Co.,* 10 B.T.A. 620; *F. P. Dastague,* 19 B.T.A. 1324; and *American Industrial Corp.,* 20 B.T.A. 188. Cf. *Steele-Wedeles* v. *Commissioner,* 63 Fed. (2d) 541.

*Issue (2).*—The question raised by this issue is substantially the same as that disposed of by the order entered August 1, 1931. In the memorandum accompanying the order we held that while the petitioner is not liable as a transferee under section 280, Revenue

Act 1926, for the deficiencies in 1922 and 1923 taxes, since it and the Cleveland & Western Coal Co. are the same corporation, it is liable as the taxpayer for the deficiencies in question; and that the notice of such deficiencies, given by the respondent, met all of the requirements of section 274. For the reasons set forth in that memorandum we adhere to our order of August 1, 1931, denying the petitioner's motion for judgment of no liability for the deficiencies in 1922 and 1923 taxes.

*Issue (3)*.—In this issue, the petitioner denies liability at law or in equity for the deficiency in the 1920 taxes of the Morgan Co. The latter, in the process of dissolution, distributed its entire assets to the petitioner, its sole stockholder, the petitioner assuming all of the outstanding obligations. Twenty-four days later the Morgan Co. dissolved. As the result of this distribution the Morgan Co. was entirely divested of means wherewith to meet its liability for the deficiency now asserted by the respondent. It is well settled that any distribution to stockholders of the assets of a corporation which renders the corporation insolvent gives rise to a liability to creditors on the part of the stockholders receiving such distribution to the extent of the value of the assets received. *Edward H. Garcin*, 22 B.T.A. 1036; *Samuel Keller*, 21 B.T.A. 84; and *R. E. Burdick*, 24 B.T.A. 1297.

Assuming the burden imposed upon him by section 602, Revenue Act 1928, of showing that the petitioner is liable as a transferee of the assets of the Morgan Co., respondent placed in evidence a statement, furnished by petitioner's counsel at the hearing, of the assets and liabilities of the Morgan Co. as of the date of the distribution, as reflected by that company's books of account. This statement shows an excess of assets over liabilities of $876,564.68. The assets and liabilities shown on this statement were entered upon the petitioner's books as of the date received, except that the notes and accounts receivable were entered in the sum of $106,969.13, the difference of $251,719.41 representing an intercompany note or account receivable due the Morgan Co. from the petitioner. Thus the net assets received from the Morgan Co. were recorded on the petitioner's books at a value of $624,845.47. The petitioner produced no countervailing evidence of value. Furthermore, the Morgan Co.'s chose in action against the petitioner in the sum of $251,719.41, relief from which was gained by the petitioner by the liquidation and dissolution of the Morgan Co. alone was more than the outstanding obligations, including the deficiency in question of the Morgan Co. We think this evidence is sufficient to establish a prima facie case for the respondent; and without countervailing evidence from the petitioner we conclude that the net value of the assets which it received in liquidation of the Morgan Co. was equal to the liability here

asserted by the respondent. The respondent is entitled to judgment on this issue.

*Issue (4).*—In the petition, as amended, the petitioner charges that respondent has understated the 1920 invested capital of the Morgan Co., due (1) to excluding or failing to include costs of $657,808 in respect of the properties acquired by that company on April 23, 1917, from the Bannock Coal Co., A. J. Morgan and the petitioner; and (2) to improper and excessive adjustments for 1917, 1918, and 1919 income and profits taxes. The respondent countered in his answer by invoking the provisions of section 331, Revenue Act 1918, alleging that in view of those limiting provisions he erred in including any amount whatever in invested capital, in respect of the aforementioned properties, and asks for an increased deficiency for the year concerned. On the brief the petitioner concedes that the limitations of section 331 are applicable to these properties; that in view of the said limitations the respondent has correctly excluded the costs of the Johnson mine extension lease and the purchase option on the Berry tract, has incorrectly included $34,989.42 in respect of the Johnson mine lease and the properties connected therewith, and has incorrectly excluded $156,731.73 in respect of the Taplin mine lease and the properties connected therewith; and the additional invested capital claimed therein is $121,742.31.

Section 331 provides that " In the case of  *  *  *  change of ownership of property, after March 3, 1917, if an interest or control in such  *  *  *  property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received:  *  *  *." The Morgan Co. acquired the Taplin mine lease and the properties connected therewith from the Bannock Coal Co., of which A. J. Morgan was the sole stockholder. It acquired the Johnson mine lease and the properties connected therewith from the petitioner. Both acquisitions were parts of the same plan of reorganization and were consummated after March 3, 1917. Immediately after the Morgan Co. acquired these properties, Morgan and the petitioner each owned 50 per centum of the capital stock of that company. Under these circumstances the amounts to be included in the 1920 invested capital of the Morgan Co. in respect of the aforementioned properties are limited by the foregoing provisions of section 331 to the values which would have been allowed in computing the invested capital of each of the predecessor owners had not the properties been transferred to the Morgan Co.

By section 326 (a), Revenue Act 1918, invested capital is defined as "(1) Actual cash bona fide paid in for stock or shares; (2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus * * *; (3) Paid-in or earned surplus and undivided profits; * * * * "

The Taplin mine lease and the properties connected therewith were acquired by the Bannock Coal Co., the predecessor owner, on January 2, 1917, from A. J. Morgan, without any consideration therefor. The amount which would have been included in that company's 1920 invested capital in respect of the lease and properties had they not been transferred to the Morgan Co. is the actual cash value thereof, as of January 2, 1917, plus the cost of any capital additions made during the ensuing period to December 31, 1919, the total being subject to proper adjustment for depletion and depreciation sustained during that period. The petitioner contends that such actual cash value is $350,000, as compared with $155,328.72 included in invested capital by respondent; but it concedes if $350,000 be accepted as the correct value that invested capital should be reduced by $52,094.91 for depletion sustained from April 1, 1917, to December 31, 1919, as compared with the respondent's depletion adjustment of $14,155.36. It makes no claim in respect of any capital additions made in the period January 2, 1917, to December 31, 1919. The respondent says the properties cost the Bannock Coal Co. nothing; hence, nothing could be included in respect thereof in that company's 1920 invested capital, and, by section 331, nothing should have been included in respect of those properties in the Morgan Co.'s 1920 invested capital. But the respondent's position is clearly wrong, since the properties, had they not been transferred to the Morgan Co., would have been included in the Bannock Coal Co.'s 1920 invested capital under section 326 (a) (3) as paid-in surplus, at their actual cash value as of January 2, 1917, with adjustment for subsequent depletion and depreciation.

The Johnson mine lease and the properties connected therewith were acquired by the petitioner, the predecessor owner, on April 23, 1917, in the liquidation of the Johnson Coal Co., of which the petitioner was the sole stockholder. The Johnson Coal Co. acquired the lease and some properties connected therewith on February 3, 1903, from the Johnson Brothers Coal Co., and issued its own stock in payment for the same. The amount which would have been included in the petitioner's 1920 invested capital in respect of the lease and

properties is also limited by section 331 to the amount which would have been included in the Johnson Coal Co.'s 1920 invested capital, had not the latter transferred the properties to the petitioner. This latter amount is, under section 326 (a) (2), the actual cash value of the lease and properties as of February 3, 1903, plus the cost of any capital additions made in the ensuing period to December 31, 1919, the total being subject to proper adjustment for depletion and depreciation sustained during that period. On the brief the petitioner contends that the amount so includable in invested capital is $135,000, as compared with $190,366.48 included by respondent; and that if $135,000 be accepted as the correct amount, invested capital should be reduced by $14,946.33 for depletion sustained from April 1, 1917, to December 31, 1919, as compared with the respondent's depletion adjustment of $35,323.39. The respondent says that there are no recognizable costs to the Johnson Coal Co. in respect of the aforementioned properties which would have been included in that company's 1920 invested capital; hence, by section 331 nothing could have been included in respect thereof in the petitioner's 1920 invested capital, and, consequently, by the same section nothing should have been included in the Morgan Co.'s 1920 invested capital in respect of these properties.

The petitioner called two witnesses to give expert opinion evidence as to the value of the Taplin and Johnson properties as of the dates of acquisition by the Bannock Coal Co. and the Johnson Coal Co., respectively, and as of April 1, 1917, the effective date of the transfers of those properties to the Morgan Co. One of them, Morgan, was formerly vice president and general manager of the Morgan Co., and has been interested in the purchase and sale and the development and operation of coal mines in the No. 8 Ohio field for about thirty years. The other, Elkins, is a geologist and mining engineer of thirty years' experience, twenty-three of which have been spent in the No. 8 Ohio field, where he has kept up the projection and planning of mines and the surveys of mined out coal and development of new properties and equipment for a large number of representative companies, and where he has also engaged in buying and selling coal properties and was consulted by different companies that were purchasing and by banks. The respondent called one expert witness who expressed no opinion as to values, but gave only his opinion as to the proper method of valuing leasehold interests generally. In addition to the expert testimony there is considerable documentary evidence bearing upon the question of values.

The $135,000 claimed by the petitioner as includable in the Morgan Co.'s 1920 invested capital, in respect of the Johnson properties, represents the opinions of its two expert witnesses as to what it cost to develop and equip the mine to the production stage which it had

reached on April 1, 1917. There is no evidence of the cost of any capital additions made after that date; and the petitioner makes no claim in respect thereof. Morgan, asked to estimate the depreciated cost of the Johnson mine on April 1, 1917, made the categorical statement, without giving his reasons therefor, that " it would cost $125,000 to $150,000 to duplicate it." Elkins expressed the opinion that the cost of developing and equipping the mine, as it stood on April 1, 1917, was $135,000. His estimate was predicated upon " a rough and ready rule of calculating the cost of developing and equipping a mine in the No. 8 field that was generally used by people in the field at that time ", of " one dollar a ton for production "; and, as he estimated the annual production of the mine to be 135,000 tons, he arrived at the estimated cost of $135,000. He also related the details of a transaction in which the Robey Coal Co. in April 1917, disposed of a developed and operating coal property of 5,000 acres, located in the No. 8 Ohio field and having an estimated production capacity of 500,000 tons per annum, to the Great Lakes Coal Co., the development and equipment being included in the consideration at a figure of $500,000.

Assuming merely for the sake of argument, for we consider the evidence is not sufficient to establish the fact, that the development and equipment in the Johnson mine, as it stood on April 1, 1917, cost $135,000, it is clear from the evidence that the whole amount would not have been included in the Johnson Coal Co.'s 1920 invested capital had it not transferred the Johnson properties. By its terms the lease agreement of June 5, 1901, under which the Johnson Coal Co. held and operated the Johnson properties,.expired on June 5, 1916; and notwithstanding the renewal privilege, the cost of development and other permanent capital additions would be written off against earnings through provision for depletion and depreciation over the original term of the lease, *Bonwit Teller & Co.* v. *Commissioner*, 53 Fed. (2d) 381; reversing 17 B.T.A. 1019; certiorari denied, 284 U.S. 690, leaving nothing in invested capital after June 5, 1916, in respect of those properties, but the salvage value of the removable property. It should be stated in this connection that there is no evidence of an intent on the part of the Johnson Coal Co. prior to June 5, 1916, to exercise its renewal privilege. Since the estimated cost of $135,000 purports to represent the entire development and equipment costs, and as there is no evidence by which to effect a segregation as between cost of permanent improvements amortizable over the original term of the lease and cost of removable property, we are unable to say what portion of the $135,000, if that figure was accepted as correct, would be includible in the 1920 invested capital.

So far as it relates to the Johnson properties, the issue must be decided adversely to the petitioner.

This brings us to the respondent's affirmative defense as it relates to the Johnson properties. As already stated, he included those properties in the Morgan Co.'s 1920 invested capital at a value of $190,366.48. Of that amount $111,494.39 was for the leasehold, $74,419.98 for machinery and equipment, $2,300 for mine supplies, $131 for office fixtures, and $2,021.11 for deferred charges. The respondent says now that it was error to have included any amount whatever in respect of those properties. For reasons already stated above we agree with that proposition so far as it relates to the $111,494.39 included for leasehold; but we disagree with it as it relates to the remaining items, because of the lack of proof that they would have been included in the Johnson Coal Co.'s 1920 invested capital, had they not been transferred, at any lower values than those which the respondent included in the Morgan Co.'s 1920 invested capital.

The $350,000 claimed by the petitioner as includable in the Morgan Co.'s 1920 invested capital in respect of the Taplin properties represents the opinions of its two expert witnesses as to the actual cash value of those properties as of January 2, 1917, the date they were paid in to the Bannock Coal Co. by Morgan. There is no evidence of the cost of any capital additions made after that date; and the petitioner makes no claim in respect thereof. The respondent included those properties in the Morgan Co.'s 1920 invested capital at a value of $155,328.72. Of that amount, $79,577.27 was for the leasehold, $74,416.50 for machinery and equipment, and $1,334.95 for mine supplies. We have found as a fact that the actual cash value of the leasehold as of the date of acquisition by the Bannock Coal Co. was $136,248.55; and the evidence is insufficient to establish that the actual cash values of the other properties were greater than those allowed by respondent in computing the Morgan Co.'s 1920 invested capital. In the part of this opinion dealing with the sixth issue, we shall discuss that finding and that insufficiency of evidence. Accordingly, the amount includable in the Morgan Co.'s 1920 invested capital in respect of the Taplin properties is $212,000, which amount is subject to adjustment for depletion sustained from January 1, 1917, to December 31, 1919, computed in accordance with the conclusions of this opinion in respect to the sixth issue.

As to the second part of this issue, the petitioner presented no proof by which we may determine the proper adjustments of 1920 consolidated invested capital for 1917, 1918, and 1919 taxes. Consequently, we may not disturb the respondent's adjustments for those taxes.

*Issue* (*5*).—The questions raised in this issue are (1) the correct amounts of intercompany accounts of affiliated corporations to be eliminated from the admissible assets for the purpose of computing the deductions from petitioner's 1920 and 1921 invested capital for inadmissible assets; (2) respondent's adjustments of the petitioner's 1920 and 1921 invested capital in respect to the Astell stock purchased by C. F. Taplin; (3) amounts includable in petitioner's 1921 invested capital in respect to the Johnson properties, the Johnson mine extension lease, and the Berry tract; and (4) proper adjustments of petitioner's 1921 invested capital for prior years' taxes.

In the findings of fact we have set forth the balances due on intercompany accounts of the affiliated corporations as of the beginning of 1920 and 1921, or as of the dates when affiliation took place, and as of the close of those two taxable years. These facts disclose that the total intercompany accounts due from affiliated corporations were $668,085.61 on January 1, 1920, or later in the same year when affiliation took place; $1,113,436.65 on December 31, 1920; $861,611.02 on January 1, 1921; and $463,934.42 on December 31, 1921. They also disclose that the net intercompany accounts—offsetting payables and receivables between the same companies—due from affiliated corporations were $430,625.61 on January 1, 1920, or later in the same year when affiliation took place; $979,566.39 on December 31, 1920; $727,740.76 on January 1, 1921; and $463,934.42 on December 31, 1921. On the basis of these figures the average total intercompany accounts are $890,761.13 for 1920, and $662,772.72 for 1921; and the average net intercompany accounts are $705,096 for 1920, and $595,837.59 for 1921. Since the evidence does not disclose whether the respondent included the total or the net intercompany accounts in the assets before eliminating the intercompany accounts, we cannot say which of the two sets of figures, average total or average net, are the proper amounts to be eliminated from the average admissible assets. Under the circumstances, the respondent's deductions from 1920 and 1921 invested capital on account of inadmissible assets must stand undisturbed so far as this particular item is concerned.

The unpaid balances on petitioner's loan to Taplin, by which the latter was enabled to purchase the Astell holdings of petitioner's stock, were $87,500 on January 1, 1920, and $2,000 on January 1, 1921. These amounts were excluded from petitioner's invested capital for 1920 and 1921 by the respondent. However, the respondent included in invested capital the sums of $4,178.74 and $1,260.27, respectively, such sums being pro rata proportions of the payments made on the loan at various times in the years concerned. In making these adjustments to petitioner's invested capital the respondent

proceeded upon the theory that the petitioner rather than Taplin was the actual purchaser of the Astell stock; that Taplin's part in the transaction was merely that of trustee or agent for the petitioner; that beneficial ownership of the stock was vested in the petitioner; that the petitioner elected this method of acquiring the stock in order to circumvent the Ohio laws forbidding a corporation to purchase its own stock, except to prevent loss on a debt; and that the transaction constituted a retirement by the petitioner of its own stock and a return or repayment of a part of the petitioner's invested capital. It is not clear why he included the pro rata proportions of the payments made on the loan; presumably he treated them as payments received upon a resale of the stock. The evidence is clear and convincing, however, that Taplin was acting for himself and two of his fellow stockholders; that he purchased the stock for his own and their account, and was not acting for the petitioner in the transaction; that he borrowed the funds with which to make the purchase from the petitioner, and later repaid the whole amount thereof; that he, as trustee for himself and his two associates, received dividends on this stock from the petitioner, which he reported in income tax returns; and that upon the recapitalization of the petitioner in 1921 he surrendered the certificates of stock for new certificates which were issued to him and his associates, according to their respective interests in the shares of stock. These facts indicate quite clearly that respondent's adjustments of petitioner's 1920 and 1921 invested capital in respect to Taplin's purchase of the Astell stock are incorrect.

In the petition as amended petitioner charges the respondent erred in excluding from, or failing to include in, petitioner's 1921 invested capital, costs of $657,808 in respect of the Taplin mine lease and properties connected therewith, the Johnson mine lease and properties connected therewith, the Johnson mine extension lease and the Berry tract. The respondent counters, as he did in answer to issue (4), which involves substantially the same question, by invoking the provisions of section 331, Revenue Act 1921 (same as section 331, Revenue Act 1918), alleging that in view of those limiting provisions he erred in including any amount whatever in invested capital in respect of the aforementioned properties, and asks for an increased deficiency for the year concerned. As set forth in subdivisions II and XI of the findings, the petitioner acquired all of the capital stock of the Morgan Co. on January 3, 1921, and on the same day liquidated the Morgan Co. and took over all of its assets and assumed its liabilities. It is not clear why the assignment of error has been made to relate to the Taplin mine lease and properties connected therewith, since, as appears elsewhere in this report, the said lease and proper-

ties were sold by the Morgan Co. in 1920 to a third party and, consequently, were not among the assets which the petitioner received upon liquidation of that company in 1921. It does not appear anywhere in the record that the petitioner acquired the lease and properties in 1921 from the purchaser thereof. Accordingly, it appears that the petitioner is not entitled to include any amount in its 1921 invested capital in respect of the Taplin mine lease and properties connected therewith. As to the other properties in question, the amounts to be included in petitioner's 1921 invested capital are, under section 326 (a) of the 1921 Act (same as section 326 (a) of the 1918 Act), the actual cash or fair market value of the properties as of the date acquired by the petitioner, but by section 331 these amounts may not exceed the values which would have been included in the Morgan Co.'s 1921 invested capital had not those assets been transferred to the petitioner. The petitioner made no offer of proof of the value of the properties in question as of the date acquired by the petitioner, and accordingly, its contentions in respect of this part of the fifth issue must fail.

As to the respondent's affirmative defense, we hold, consistent with our decision on the fourth issue, that nothing is includable in invested capital in respect of the Johnson mine lease; but as to the properties connected with that lease the respondent produced no proof that the amount includable in invested capital is less than what he allowed.

The petitioner presented no proof by which we may determine the proper adjustments of 1921 consolidated invested capital for 1917, 1918, and 1919 taxes. The correct tax liability for 1920 is one of the matters before us in these proceedings, and the proper adjustment of 1921 consolidated invested capital on account of that liability will be determined under Rule 50.

*Issue (6).*—In this, the sixth issue, the petitioner complains of the inadequacy of the respondent's allowances, in computing the Morgan Co.'s 1920 net income and the petitioner's 1921, 1922, and 1923 net income, for depletion of the Taplin mine lease, the Johnson mine lease, and the Berry tract. The respondent counters in his answer with the allegation that the depletion deductions which he allowed are excessive; and he asks for increased deficiencies for the years concerned on that ground.

Section 214 (a) (10) of the 1918 and 1921 Acts provides:

That in computing net income there shall be allowed as deductions:

\*        \*        \*        \*        \*        \*        \*

(10) In the case of mines * * * a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise de-

ducted * * *. In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and lessee.

The Morgan Co. was the owner of the Taplin mine lease until it sold the same to a third party on September 30, 1920. It owned the Johnson mine lease, including the extension, during all of 1920. There is no evidence as to when it acquired the Berry tract, the record showing only that it acquired the purchase option on that tract in 1917 and that no coal was mined therefrom during the period of its ownership by the Morgan Co. The depletion allowances for 1920, in respect of the Taplin mine lease and the Johnson mine lease, therefore, must be based upon the cost to the Morgan Co. of those properties. Since the petitioner owned the Johnson mine lease, including the lease extension and the Berry tract during all of 1921, 1922, and 1923, the depletion allowances for those years in respect of those properties must be based upon their cost to the petitioner.

The petitioner did not produce one iota of evidence of the cost to it of the Johnson mine lease, including the extension, and the Berry tract, which properties it acquired upon the liquidation of the Morgan Co., on January 3, 1921. Without evidence of such cost we are unable to determine what are reasonable allowances for depletion of these properties for 1921, 1922, and 1923, and, consequently, we must affirm the respondent's allowances to the petitioner for those years.

The petitioner contends upon the basis of the testimony of its two expert witnesses that the cost to the Morgan Co. of the Taplin mine lease and properties connected therewith, the Johnson mine lease, including the extension, and the properties connected therewith, and the Berry tract were $375,000, $525,000, and $167,500, respectively. It allocates the alleged cost of the Taplin properties, $299,248.55, to the lease, $74,416.50 to machinery and equipment, and $1,334.95 to supplies; and the alleged cost of the Johnson properties, $446,127.91, to the lease, including the extension, $74,419.98 to machinery and equipment, $2,300 to mine supplies, $131 to office fixtures, and $2,021.11 to deferred charges. The respondent determined that the cost of the Taplin properties was $155,328.72, of which $79,577.27 was for the lease, $74,416.50 for machinery and equipment and $1,334.95 for supplies. He also determined that the cost of the Johnson properties was $190,366.48, of which $111,494.39 was for the lease, $74,419.98 for machinery and equipment, $2,300 for mine supplies, $131 for office fixtures, and $2,021.11 for deferred charges. He further determined that the cost of the Berry tract was $63,966.80. Since the Morgan Co. paid for the Taplin and Johnson properties with shares of its own stock, and lacking any direct evidence from the petitioner as to the value of such shares, we may inquire as to

the fair market value of the properties as of the date of acquisition to determine their cost.

Morgan expressed the opinion that the values of the Taplin and Johnson properties as of the date of acquisition by the Morgan Co. were $325,000 and $500,000, respectively. He testified as to the conditions existing in the No. 8 Ohio field in 1917, stating that " labor was scarce, cars were scarce and prices were high, and the people as a rule had gone crazy on coal companies "; that " the war was on, and that was the starting of the high prices for coal "; that operating mines " were mostly sold on production     *     *     *     in other words, an acreage would not be worth much more than originally, but production would be worth, I would say $2 or $3 a ton "; that the annual production of a mine located on the Baltimore & Ohio Railroad and the Wheeling Railroad, such as the Taplin mine, was worth $2 a ton, but a mine located on the Pennsylvania Railroad and the New York Central Railroad was worth $3 a ton; that the Baltimore & Ohio " was giving less than 50 percent car supply ", while " the Pennsylvania and the New York Central were giving about 85 percent, I would say ", and " that is where the difference of $2 and $3 came in that the people would pay for properties "; that the Taplin mine "would have cars for 100,000 tons "; that coal prices began to go up about December 1916 or January 1917, so that the value of the mine was about the same in January 1917 as on April 1, 1917, in fact, all during 1917 until Government prices went into effect, then the bonus would be lost, but there would be some bonus even after Government prices· were established; and that the value of the mine would be the bonus value of the annual production, plus its cost or its normal value of acreage, machinery, and equipment, and so forth. He further testified that in arriving at a value of $325,000 for the Taplin mine and whatever else went with it, " I· figure the mine cost $125,000, and the bonus was worth $200,000 in 1917 "; and that the Taplin mine could have been sold for $325,000 as of April 1, 1917. He also testified that he thinks the annual production of the Johnson mine in April 1917 was about 150,000 to 175,000 tons; that that production " would be worth $2.50 or $3.00 a ton bonus on the property "; and that, as to the value of the Johnson mine in April 1917 without the bonus value for annual production, " it would cost $125,000 to $150,000 to duplicate it. You would have to dig the slope and sink the shafts and they were already sunk and complete."

Elkins expressed the opinion that the value of the Taplin properties in January 1917, when acquired by the Bannock Coal Co., was $350,000; that the value of the Taplin properties in April 1917, when acquired by the Morgan Co., was $375,000; that the value

of the Johnson mine as of the date of acquisition by the Morgan Co. was $525,000; and that the value of the Berry tract as of April 1917, when the Morgan Co. acquired from A. J. Morgan the purchase option on that tract, was $167,500. He also testified as to the conditions existing in the No. 8 Ohio field in 1917, stating that there was a rough and ready rule for calculating the cost of developing and equipping a mine in the No. 8 Ohio field that was generally used by people in the field at that time, " We figured one dollar a ton for annual production. That was a very safe method to use." He testified that prices for free coal rose from $1.05 a ton in April 1916 to $1.90 a ton in October 1916, and to $4 a ton in January 1917, and there was practically no change in the first three months of 1917; that " the operators tried not to let it get over $4 a ton. They thought that was high enough. There were odd cases where they let it run away and made all they could, but the larger percentage of good operators were trying to hold the basis about $4 a ton. Shortly after April 1, they went into what was known as the Lane-Peabody agreement "; and Government prices went into effect about August 21, 1917; that the prices of $1.90 a ton in October 1916 to $4 a ton in January 1917 were generally on small amounts of coal, because most mines had 60 to 80 percent of production tied up under contract; that he did not realize at the time that the high price of January 1917 " was going to last long, but it began to steady up after the United States entered the war and it looked like we would have it for some time. I did not realize right off what was taking place. I did not know at that time we were going to get in the war. We had just gone through with a campaign about having kept out of the war. * * * Along about the first of 1917 we all realized we were going to get into the war and would have prevailing conditions for some time "; that the coming of the new coal contract season, April 1, 1917, had a greater effect upon the value of the mines than the sales price on small amounts of coal; that mine values were higher at April 1, 1917, than in the first ten days of 1917, because April 1 is the beginning of the new contract year and prices were about four times as high on April 1, 1917, as on April 1, 1916; that the car supply in January 1917, following five or six weeks of zero weather which resulted in a bad breakdown of railroad equipment, was about 30 percent of normal, reaching about 90 percent about the middle of February and through March, and falling off far below expectations during the remainder of the year because of conditions which arose that could not be foreseen in the early part of the year; that the demand for cars was present all through 1917, and the production was restricted only because of the condition in the car supply; that buyers of coal mines in the No. 8 Ohio field

"figure an allowance for the year's tonnage available, plus the equipment of the mine", the total being the value of the mine; that in April 1917 the Robey Coal Co. sold 5,000 acres of developed coal property, having an estimated annual production of 500,000 tons, to the Great Lakes Coal Co. for $2,500,000, the said coal property being located in the No. 8 Ohio field, on the Wheeling Railroad; that he participated in the negotiations leading up to that transaction, and that the selling price was arrived at as follows: "We figured a scale producing half a million tons a year, but we took into consideration the car supply would not let us have that. We brought it down to 30,000 tons a month, or 360,000 tons a year. From those figures, on a basis of $1,000,000 for this 360,000 tons of coal and the remaining acreage, we figured at $200 per acre, arriving at these figures"; that the $1,000,000 bonus on a basis of 360,000 tons annual capacity, figured in the selling price, was figured at $2.75 per ton of annual production; "the reason we arrived at that figure, the available figures for cost of coal along about that time $1.25 per ton and the sales price $4. The difference between the $1.25 and the $4 was the $2.75", which was a bonus for going mines with production presently available; that the equipment was included in the sale price at a figure of $500,000; and that there were other sales made on the same basis. He further testified that in arriving at a value of $525,000 for the Johnson mine, "I took 135,000 tons annual production at $2.75. * * * I added the development and equipment, $135,000. That gave $506,250; and the balance I put into the lease extension of this Johnson property"; and the figure of $525,000 represented the value of the Johnson mine based upon "what mines were selling for in the field." Explaining how he arrived at a value of $375,000 for the Taplin mine, he stated: "I figured 100,000 tons of annual capacity in that mine at $2.75 per ton, which would be $275,000, plus $100,000 for development and equipment; that would make $375,000." He further testified that he arrived at a value of $167,500 for the Berry tract on the basis of "the going price for coal lands adjoining developed mines at that date."

It appears from the record that both expert witnesses are, more or less, interested parties; but aside from that, there are other and more cogent reasons why their opinions of values of the Taplin and Johnson properties should not be accepted. The so-called "rough and ready rule" by which they purport to measure the cost of developing and equipping the Taplin and Johnson mines, is, as we understand it, a rule for measuring the probable cost of developing and equipping a mine to the point where it will maintain a certain production. Whether it contemplates the installation and use of

new or secondhand machinery and equipment, or both, we do not know; and that seems to us to be an important factor, if we are to accept the rule for the purpose for which it was offered, because the record discloses that the machinery and equipment in both the Taplin and Johnson mines, at the dates acquired by the Bannock Coal Co. and the Morgan Co., were well advanced in the number of years of use. It merely begs the question to say that the rule was used in the Robey Coal Co.-Great Lakes Coal Co. transaction in 1917, in which a very large coal acreage was transferred, for we have no way of comparing the standard and condition of the development, machinery and equipment involved in that transaction with that of the Johnson and Taplin mines. Without the flexibility necessary to reflect the peculiar conditions of the properties to be valued, the rule is a poor substitute for proved facts which would enable us to reach an independent judgment as to the cost of those properties. Furthermore, it clearly appears from the record that the witnesses' opinions of values comprehend fee estates, rather than the lesser estates of leasehold interests, and it is the latter which we are called upon to value here. Valuations of the two estates require consideration of different factors; and it would be a mere coincidence if perchance the values of both were the same. There is also the Johnson mine extension lease running from 1931 to 1946, upon which the witness Elkins placed a value of $18,750. According to the witnesses' estimates, as of April 1, 1917, of the probable future production, the recoverable coal in the acreage covered by that lease would be exhausted before 1931. The evidence shows that all of the coal had been mined out and the mine abandoned by 1929. It is evident, therefore, that the chief value of that extension lease was in the haulage rights granted to the lessee, to haul over and through the leased premises coal mined from other lands. That value could not be determined by reference to sales of operating mines, as it appears Elkins has done. We were given no facts upon which we might predicate any conclusion as to the value of such haulage rights.

Coming to the other evidence bearing upon the question of values, which we shall not attempt to discuss at any great length, there is the purchase by the petitioner, in November 1916, of all of the capital stock of the Johnson Coal Co., the then owner of the Johnson properties, and of a fifteen-year extension—presumably, 1916 to 1931—of the Johnson mine lease, for a total price of $83,465.82, which, considering the then indebtedness of the Johnson Coal Co., represented a value for that company's entire assets of approximately $100,000; and the minutes of the meeting of petitioner's directors containing a report on, and ratification of, that purchase set forth that " we are practically paying $100,000 for this company as it now stands (there being nothing on the books for development) and it was on this basis that

it seemed desirable to take over the property." We do not have a balance sheet of the Johnson Coal Co. as of the date of petitioner's purchase of its stock. One, as of January 1, 1917, some forty-seven days after the purchase, shows cash and outstanding accounts receivable of that company in the amount of approximately $31,700. But, even if there were no cash or accounts receivable among the Johnson Coal Co.'s assets as of the date of petitioner's purchase of its stock, the price paid for the stock would indicate that the Johnson properties, later transferred to the Morgan Co., were not worth more than $100,000 in November 1916. Elkins' estimate of the value of the properties as of that time was $250,000.

While the Taplin mine, as of the date of acquisition of the leases by the Morgan Co., contained approximately 100,000 more tons of coal than the Johnson mine, that advantage of the Taplin mine was largely offset by the greater annual production capacity and newer equipment of the Johnson mine. That the two properties were regarded as of equal value is evident by the Morgan Co.'s issuance of an equal amount of stock, $212,000 par value, in payment for each of the properties. If the difference in value between the two properties as of the date paid in to the Morgan Co. was as great as is indicated by the opinion evidence of petitioner's expert witnesses, it is difficult to understand why they were transferred by different parties for equal interests, 50 percent each, in the Morgan Co. Certainly there is no explanation in the record for that seemingly improbable situation.

In the capital stock tax return which it filed for the fiscal year ended June 30, 1917, introduced in evidence by the respondent, the Morgan Co. reported the fair value of its 5,000 shares of outstanding capital stock to be $575,000, and an estimated fair value per share of $115, and the tax was computed and paid upon the basis of such estimated value. On the basis of this estimated fair value the value of the shares issued for each of the Taplin and Johnson properties was $243,800. Deducting from that figure, in each instance, the values of the properties other than the leases, upon which the parties appear to be in agreement, the share values allocable to the Taplin mine lease and the Johnson mine lease are $168,048.55 and $164,-927.91, respectively. These leases were entered upon the Morgan Co.'s books in the amounts of $136,248.55 and $133,127.91, respectively.

Taking the record as a whole, we are of the opinion that the value of the Taplin mine lease as of January 2, 1917, the date acquired by the Bannock Coal Co., and as of April 1, 1917, the effective date of the transfer of the lease to the Morgan Co., was $136,248.55; and that the value of the Johnson mine lease as of April 1, 1917, the effective date of its acquisition by the Morgan Co., was $133,127.91. We have made findings to that effect.

On the basis of the findings, the depletion rates for 1920 for coal mined from the Taplin and Johnson mines are 9.6 and 10 cents per ton, respectively. Therefore, the Morgan Co.'s depletion allowances for 1920 are $5,960.16 on the 62,085 tons mined from the Taplin mine, and $14,217.60 on the 142,176 tons mined from the Johnson mine.

*Issue (7).*—This issue arises out of respondent's affirmative defense that the deductions which he allowed for depreciation of machinery and equipment used in connection with the Taplin and Johnson mines are more than reasonable allowances for such depreciation. He failed to submit any proof of facts supporting the allegation; hence, the deductions which he has allowed must stand.

*Issue (8).*—The petitioner contends that the Morgan Co. sustained a loss of $172,567.84 in 1920 upon the sale of the Taplin properties to A. J. Morgan. The alleged loss is $67,037.77 greater than the loss shown by the Morgan Co.'s books of account. The petitioner computes the loss as follows:

| | | |
|---|---|---|
| Original cost of Taplin properties (based upon alleged fair market value, as of date of acquisition by Morgan Co. from Bannock Coal Co.) | $375,000.00 | |
| Cost of net additions made by Morgan Co | 94,165.82 | |
| Total cost of properties sold | | $469,165.82 |
| Less: Depletion sustained to date of sale (computed on basis of an original cost of $375,000 for the properties) | 65,626.44 | |
| Depreciation sustained to date of sale | 35,971.54 | |
| | | 101,597.98 |
| Depleted and depreciated cost | | $367,567.84 |
| Selling price | | 195,000.00 |
| Loss sustained on transaction | | $172,567.84 |

We have already held, in deciding the fourth issue, that the original cost of the Taplin properties, based upon their fair market value as of the date of acquisition from the Bannock Coal Co., was $212,000, of which $136,248.55 is allocable as the cost of the lease. Since respondent's basis is predicated upon an original cost of only $79,577.27 for the lease, that basis is understated by the difference, $56,671.28, between the original cost determined by the respondent and the original cost we have found, $136,248.55, less the additional depletion of $12,291.93, computed at the rate of 3.95 cents per ton on 311,188 tons mined on said additional cost of $56,671.28 allowed in this opinion. The proof does not establish the necessity for any other adjustments in respondent's determination. We, therefore, find that the Morgan Co. sustained a loss of $45,390 upon the sale of the Taplin properties to A. J. Morgan in 1920.

*Issue (9).*—In this issue, the petitioner charges that the respondent has allowed inadequate deductions for 1921, 1922, and 1923 for de-

preciation of the Johnson River tipple. The parties have filed a written stipulation to the effect that "the Board may find the useful and depreciable life of the Johnson River tipple to be five years"; and that "The sole remaining issue, with respect to said Johnson River tipple, is what is the proper cost basis recoverable by depreciation." The petitioner contends that the recoverable cost is $105,713.01, the actual total cost, to the Morgan Co. and to itself, of constructing the tipple; while the respondent contends that the evidence fails to establish any greater cost than $21,246.71 [$20,846.71], the amount actually expended by the petitioner to complete the tipple following the acquisition by the petitioner, in the liquidation of the Morgan Co., of the uncompleted structure.

The contracts with the Power Co. are not in evidence. However, A. J. Morgan, who personally negotiated the original contract, testfied as to the terms relating to the construction of the tipple, as follows:

Q State whether or not the tipple was built in reliance upon the contract?
A Do you want the story?
Q I would like to have it while you are here. You probably know it better than any one else.
A The power company could not get coal. We agreed to build the tipple and they to furnish the money. They could not furnish the money, then they gave us an iron-clad contract to build a tipple and add one dollar on the price of the coal to pay for the tipple.

It is evident from this testimony that the entire cost of building the tipple was to be borne by the Power Co. There is no evidence that the contract was not carried out in this respect. The petitioner delivered a total of 144,125.90 tons of coal to the Power Co. under the three contracts; and if one dollar was added to the per ton price of the coal which the Power Co. was to pay, "to pay for the tipple", as Morgan states the contract provided, the petitioner has been entirely reimbursed for the $105,000 expended in constructing the tipple, and there is nothing to be recovered through annual deductions for depreciation. In this connection, it should be stated that there is no evidence that the one dollar added to the contract price for each ton of coal shipped as payment for the tipple has been included by the petitioner in gross income reported in its returns. Under the circumstances, we find that the petitioner is not entitled to any deductions for 1921, 1922, and 1923 for depreciation of the Johnson River tipple.

*Issue (10) and the alternative issue (11).*—The respondent affirmatively alleges that petitioner deducted from 1921 gross income the sum of $253,405.57, representing an amount set aside on its books as a reserve against an unadmitted claim of the Main Island Co. which was then in litigation, and that he erroneously allowed such deduction

in his deficiency determination for 1921, and he asks for an increased deficiency for the year concerned on the basis of such alleged facts. The petitioner contends that respondent has erroneously disallowed the deduction of $66,601.38 from 1922 income, of which $60,604.58 represents the amount by which the judgment returned against it in 1922 in favor of the Main Island Co. exceeded the liability to the latter shown on petitioner's books, and $5,996.80 represents the interest on the judgment from date of rendition to the close of 1922. The petitioner further contends that the respondent has erroneously disallowed the deduction from 1923 income of $24,256.75, representing the interest on the judgment accruable in that year. In the alternative, the petitioner contends that the respondent erred in his deficiency determinations for 1920 and 1921, in failing to allow as deductions for those years the amounts of $2,664.50 and $21,800.56, respectively, for interest accrued on an account payable to the Main Island Co.

The so-called reserve to which the respondent refers is the credit balance of $253,405.57 in the " Main Island Creek Coal Company Adjustment Account ", which was created by the entries of February 28 and May 31, 1921, as set forth in subdivision XVI of the findings of fact. It is clear from those findings that the credit balance was not created by any deduction from income, or the exclusion of an item properly includable in taxable income, but is attributable solely to book entries by which a portion of petitioner's liability in the account payable with the Main Island Co. was transferred to this adjustment account, to be held in suspense and not paid pending the outcome of the litigation instituted by the Main Island Co. to recover under the exchange contract of September 10, 1920. It is also clear that none of the items appearing in the account payable from which the transfers to the adjustment account were made were deducted by the petitioner in computing 1921 net income. Furthermore, there is no satisfactory proof that the amount in question was allowed as a deduction by the respondent in his deficiency determination for 1921. Under the circumstances we find that the respondent's affirmative defense is without merit and his prayer for an increased deficiency for 1921 as to this item is denied.

Of the amount of $60,604.58 which the petitioner contends should be deducted from 1922 income, $19,668 represents a portion of the Main Island Co.'s claim upon which the latter obtained judgment in 1922, and $40,936.58 the amount of interest included in that judgment. The petitioner's claim to the deduction of the amount of $60,604.58 is predicated upon the theory that the deposit of the Liberty bonds with the United States District Court as security for its supersedeas bond constituted a payment of the judgment re-

turned against it in that court; and that such payment of the judgment in 1922 gave rise to a deduction for that year, notwithstanding that it appealed to the United States Circuit Court of Appeals as to so much of the judgment as exceeded the admitted liability to the Main Island Co. reflected by the petitioner's books of account.

On its books of account the petitioner showed a total liability to the Main Island Co. of $343,674.60. That amount was $19,668 less than the Main Island Co.'s claim of $363,342.60, for which amount judgment with interest of $40,936.58 was obtained by the latter in 1922. This difference of $19,668 is due to the petitioner's claim of partial payment of the Main Island Co.'s claim by the Panhandle shipments of 1920, which shipments were rejected by the Main Island Co. as made after the expiration of the contract. In computing net income in its 1920 return the petitioner deducted, as cost of sales, the aggregate amount of the Main Island Co.'s invoices covering the shipments made to lake ports for the petitioner's account; and the amount so deducted obviously included the whole amount of the Main Island Co.'s claim. In the present state of the record, we can not say that that deduction was wrong. Obviously, then, the petitioner is not entitled to deduct again any part of that claim in the year of payment. It is equally obvious, however, that the amount of the rejected Panhandle shipments was improperly included in the 1920 consolidated income. These shipments when made by the petitioner were immediately rejected by the Main Island Co. The coal was sold for charges, and neither the petitioner nor the Standard Island Co., which shipped the coal for the petitioner, ever received anything therefor. At the close of 1920 there merely existed a claim of right on the part of the petitioner to have these shipments offset or credited against its liability to the Main Island Co., a claim that was disputed by the latter and which was finally held, in the litigation of the Main Island Co.'s claim, to be without any foundation and was not allowed. Of the $60,604.58 deduction claimed by the petitioner, $19,668 is, under the circumstances above noted, clearly not allowable. On the other hand, the consolidated net income for 1920 should be reduced by the elimination of the Panhandle shipments amounting to $19,668.

As to the remaining sum of $40,936.58, being the amount of the interest included in the judgment rendered against the petitioner in 1922, this amount is not a proper deduction for 1922. There was no admission of liability for this amount on the part of the petitioner in 1922. The judgment was appealed by the petitioner to the United States Circuit Court of Appeals, and upon affirmance by that court, writ of certiorari was applied for to the United States Supreme Court and denied by the Court on June 5, 1924. The judgment

entered in 1922 was not final so long as an appeal was pending before a higher tribunal. During the pendency of the appeal it was not known that there would be any liability to respondent for the amount claimed. It was clearly contingent and therefore was not properly accruable. Cf. *Lucas* v. *American Code Co.*, 280 U.S. 445; *Llewellyn* v. *Electric Reduction Co.*, 275 U.S. 243; *Consolidated Tea Co.* v. *Bowers*, 19 Fed. (2d) 382; *Central Trust Co.* v. *Burnet*, 45 Fed. (2d) 922; *Highway Trailer Co.*, 28 B.T.A. 792.

The petitioner relies on *Becker Bros.* v. *United States*, 7 Fed. (2d) 3, and *Malleable Iron Range Co.* v. *United States*, 65 Ct. Cls. 441, to support its right to a deduction in the year claimed. It was held in those cases that where cash or bonds are deposited in trust or in escrow as a supersedeas, such deposit is equivalent to payment of the judgment and will support a deduction from income to the extent of the deposit, notwithstanding the fact that an appeal is pending from the judgment. The facts clearly disprove the premise of petitioner's contention to the effect that the judgment was paid in 1922, as the Liberty bonds deposited with the court as security for the supersedeas bond were not so deposited until January 25, 1923. Under the circumstances the amount of $40,936.58 may not properly be deducted from 1922 income.

While the decisions last above cited would appear to warrant a deduction of the amount in 1923, we think the trend of decisions of the Supreme Court and other Federal courts, as well as of the Board, is contrary thereto. The prevailing rule appears to be that unless the circumstances are exceptional, the deduction may be taken only in the year in which the liability becomes fixed by a final judgment. We are unable to see how a deposit in escrow or in trust of moneys or securities as a supersedeas adds anything by which the liability becomes fixed and determined. Its only effect is to guarantee the payment of the judgment in the event of its affirmance.

We are of the opinion that the amount in question is not properly accruable as a deduction in the year 1923, but should be accrued when the petition for certiorari was denied by the Supreme Court in the year 1924.

As to the further sums of $5,996.80 and $24,256.75 which petitioner seeks to deduct from 1922 and 1923 income, respectively, as interest on the judgment accruable in those years, we hold that these are not proper deductions for any year prior to 1924, in which year litigation was finally completed and the petitioner's liability for payment of the interest was determined.

As to the petitioner's alternative contention of right to deduct from 1920 and 1921 income the sums of $2,664.50 and $21,800.56,

respectively, as interest accrued in those years on its liability to the Main Island Co., the petitioner produced no proof which would establish its right to deduct these amounts.

*Issue (12)*.—This issue has been settled by the stipulation of the parties as to the companies affiliated with the petitioner during the taxable years in question. The substance of that stipulation is set forth in subdivision III of the findings of fact, and effect will be given thereto in the recomputation under Rule 50.

*Issue (13)*.—In this issue, the respondent affirmatively alleges that he erred in his deficiency determination for 1923, in failing to include in income the petitioner's distributive share, $3,675.25, of the profits earned in that year by the syndicate of which the petitioner was a member. At the hearing, counsel for the petitioner conceded that the petitioner's share of the syndicate profits for 1923 was $3,675.25, and that if the profits of a syndicate are taxable to the members for the year in which earned by the syndicate, the petitioner's 1923 net income, as determined by the respondent in the deficiency notice, should be increased by $3,675.25. On brief, the petitioner concedes that if the Board has correctly interpreted the law on the latter point in *Frank G. Wild*, 24 B.T.A. 691, and *Glenmore Securities Corp.*, 24 B.T.A. 697, then the respondent's affirmative allegation is correct. In the two cited cases, which are companion cases, a syndicate, which was not a taxable entity under the revenue acts, earned net income which was not distributed to the members during the years when earned. The time of making such distribution was, by agreement of the members, left to the discretion of one of their number, who was the syndicate manager. It was held by this Board that the distributive net earnings of the syndicate constituted taxable income to the members in proportion to their respective interests, for the year or years when earned. Our decisions in the two cases have since been reversed by the Circuit Court of Appeals for the Second Circuit, in *Wild* v. *Commissioner*, 62 Fed. (2d) 777, and *Glenmore Securities Corp.* v. *Commissioner*, 62 Fed. (2d) 780; and upon authority of the decisions of that court, we must hold adversely to the respondent on this issue.

> *The proceeding in Docket 28278 will be restored to the general calendar for assignment for hearing in due course on the special assessment issues, under Rule 62 (b), unless the petitioner files a waiver of such issue within 30 days after the promulgation hereof, in which event, judgment will be entered under Rule 50. Judgment in Docket 38298 will be entered under Rule 50.*