GRACE CAPPUCCILLI, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Cappuccilli v. Commissioner
Docket Nos. 2095-77, 2097-77, 2207-77, 2208-77, 5255-77, 5801-77.
United States Tax Court
T.C. Memo 1980-347; 1980 Tax Ct. Memo LEXIS 239; 40 T.C.M. (CCH) 1084; T.C.M. (RIA) 80347; August 28, 1980, Filed Victor Chini, for the petitioners. Kenneth Bersani and John D. Steele, Jr., for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In these consolidated cases, respondent has determined deficiencies against petitioners for the taxable years 1970, 1971, and 1972 as follows: Petitioner
Docket No.
Year
Deficiency
Grace Cappuccilli
2095-77
1970
$ 7,140.13
1971
7,089.58
2208-77
1972
69,974.26
Dorothy Cappuccilli
2097-77
1970
7,422.54
1971
7,467.60
2207-77
1972
71,077.22
Gerald F. and Caroline
Paduano
5801-77
1970
7,590.10
1971
6,486.68
5255-77
1972
59,895.65
The tax year 1975 is also involved for all of the petitioners because of, and to the extent of, a disputed bad debt deduction which resulted in a claimed loss carryback to 1972. [2]
*242 The issues presented in these cases are: (1) whether respondent properly allocated interest for the years 1970, 1971, and 1972 under section 482 [3] to the partnership of Cappuccilli, Cappuccilli, & Paduano (CCP or the partnership) from two related corporations on account of mortgage notes held and cash loans made by CCP; (2) whether interest income properly allocated to CCP under section 482 on account of the above-mentioned mortgages and cash loans in 1967, 1968, and 1969 (see Paduano v. Commissioner, T.C. Memo. 1975-69, affd. mem. 538 F.2d 312 (2d Cir. 1976), cert. denied 425 U.S. 992 (1976)), may be the subject of a bad debt deduction in either 1972 or 1975; (3) whether the gain which CCP realized pursuant to section 1038, because of his foreclosure of a mortgage in 1972, is ordinary or capital in nature, and, if capital, whether it is long or short term. FINDINGS OF FACT Some of the facts were stipulated. The stipulations of facts and stipulated exhibits are incorporated *243 herein by this reference. At the time the petitions herein were filed, Grace Cappuccilli (Grace) and Dorothy Cappuccilli (Dorothy) resided in Syracuse, New York, and Gerald F. Paduano (Paduano) and Caroline Paduano resided in Sarasota, Florida. Grace, with her husband Peter L. Cappuccilli (Peter), who is not a party to these cases, timely filed jointed income tax returns with the North Atlantic Service Center, Andover, Massachusetts, for the taxable years 1970, 1971, and 1972, as did Dorothy and her husband Rocco M. Cappuccilli (Rocco), who is also not a party to these cases, and the Paduanos. On May 6, 1976, Peter and Rocco each filed separate petitions with the United States District Court for the Northern District of New York, pursuant to Chapter XII of the Bankruptcy Act. Pursuant to section 6871, the District Director of Internal Revenue, Buffalo, New York, assessed income tax deficiencies for the taxable years 1970, 1971, and 1972 against both Peter and Rocco. The deficiencies which were assessed against them are the deficiencies which are the subject of their wives' petitions herein. In 1954, Peter, Rocco, and Paduano (hereinafter collectively referred to as the *244 developers) formed CCP. Each had a one-third interest in the partnership. CCP was principally engaged in the real estate business in the Syracuse, New York, area. Stonehedge Development Corporation (Stonehedge) was organized on April 8, 1953. The stock of Stonehedge was owned equally by Peter, Rocco, and Paduano from its organization through May 26, 1969. Seneca Sewerage Corporation (Seneca) was organized on April 1, 1961, for the purpose of operating a sanitary sewage treatment plant. The stock of Seneca was owned equally by Peter, Rocco, and Paduano through May 26, 1969. On May 27, 1969, Paduano retired from active participation and ownership in all the corporate and business ventures they had undertaken together, except with respect to the partnership. Subsequently, in 1969, and in all of 1970, 1971, and 1972, the stock of Stonehedge was owned equally by Peter and Rocco, as was the stock of Seneca. The partnership ownership interests remained the same, although Paduano did not take an active part in the operations of CCP. The general plan of the developers was to have CCP acquire options and purchase individual properties until it had put together a parcel of land which *245 could be developed; CCP would make no efforts to improve or subdivide the parcel but would subsequently sell it, at a profit, to Stonehedge, which would make the necessary improvements, obtain new zoning (if necessary), subdivide the lots, and construct and sell houses or other buildings. The proceeds from these sales would provide Stonehedge with the necessary funds to discharge the obligations which it incurred in acquiring the land from CCP. CCP also owned other properties for investment purposes, such as a bowling alley, an office building, and other rental properties.
Between 1955 and 1962, Stonehedge developed a community known as Seneca Knolls in the Town of Van Buren, New York. Henderson farm, lying adjacent to Seneca Knolls, was purchased by CCP on March 8, 1960, for $125,460. The farm was sold to Stonehedge on February 20, 1961, in consideration of a cash payment of $28,122.25, the assumption of mortgage obligations totaling $107,605.14, and a note in the amount of $81,000, bearing interest at six percent per annum, secured by a purchase money mortgage, and providing for payment of principal to be made in equal installments plus interest on the first and second anniversaries *246 of the sale. During the period February 22, 1961, through January 3, 1962, CCP acquired five contiguous farms (hereinafter the Seneca Knolls farms) at a total cost of $320,083. [4]The Seneca Knolls farms lay between two previously completed sections of the Seneca Knolls Community. CCP anticipated that the Seneca Knolls farms would be sold to Stonehedge (or another developer) who would then subdivide them into lots for individual sale. Prior to purchasing the Seneca Knolls farms, however, Stonehedge wanted to be relatively certain that the Town of Van Buren would rezone the land for residential lots of the size they desired. Peter and Rocco had contacts with various town officials and were given conflicting signals regarding the zoning request. Nonetheless, in late 1961 and early 1962, their lawyer, *247 James M. Cerio, [5] drafted the necessary documents for the Seneca Knolls farms to be transferred to Stonehedge. Cerio brought these documents -- a closing statement, mortgage note, mortgage, and the deed -- with him to a meeting at the developers' offices on January 10, 1962. At that meeting, Peter signed the closing statement, note, mortgage, and deed as president of Stonehedge; Peter, Rocco, and Paduano all signed the deed. During the meeting, while signing the documents, the parties realized that there was a serious question whether the zoning request, with negotiated modifications, would be approved. Consequently, the individuals held up signing the closing statement and concluding the sale until they were reasonably satisfied that the zoning problem would be resolved. Cerio left and Peter placed the documents in the CCP files in the office. [6]CCP paid the real estate tax on the properties for 1962. On December 28, 1962, another meeting *248 was held to close the sale. Checks were written to cover transfer and recording fees, legal fees, and the cash balance due CCP according to the closing statement. Cerio recorded the deed later that day; when the deed was returned after the recording, it was placed in the Stonehedge file. Stonehedge made no payments on the purchase between January 10 and December 28, 1962. The total purchase price for the farms was $1,353,600. Stonehedge was to assume mortgages on the land (from CCP's purchases) totaling $275,170. In addition, it gave CCP a mortgage and non-interest bearing note for $1,075,000 to be paid $75,000 on January 10, 1964, and $100,000 on each successive January 10 until the balance was paid in full. The deed, note, and mortgage retained the January 10, 1962, date reflected in the documents originally prepared for the sale. After the January 10, 1962, meeting, Stonehedge continued its attempts to get the zoning change. In an application to the Planning Board of the Town of Van Buren in June 1962, Stonehedge stated that the land was "now owned by deed or contract by Stonehedge," and that "[prior] to development, complete title by deed will be held by the Corporation. *249 " Its petition to the Town Board merely made the former statement as did Cerio in his appearance for Stonehedge at an August 16, 1962, hearing on the application. [7] Cerio's presentation, as well as the petition to the board, explained that the development planned on the parcel was "in conformity with the developer's master plan of development conceived and laid out prior to the enactment of the present zoning ordinances [in 1961]." The Town Board refused Stonehedge's request, so Stonehedge brought an action to compel approval of the rezoning request in August 1963. In its complaint, Stonehedge stated that it "is and at all times hereinafter mentioned was the owner of [the Seneca Knolls farms];" that period included the summer of 1962, during which time the rezoning applications were pending. During all of the taxable years 1970 and 1971, and during the period from January 1 until March 13, 1972, CCP carried two mortgage receivables on its books and records due from Stonehedge. These mortgages resulted from the sale of the Henderson farm and the Seneca Knolls farms by CCP to Stonehedge. The *250 outstanding balances on these two mortgages on various relevant dates were as follows: Date
Henderson Farm
Seneca Knolls Farms
Date of purchase
$81,000
$1,075,000
1/1/70
70,000
1,052,850
12/31/70
70,000
1,052,850
1/1/71
70,000
1,052,850
12/31/71
70,000
1,052,850
1/1/72
[8]-- [9] 1,010,972 3/12/72
--
1,010,972
During the taxable years 1970, 1971, and 1972, CCP carried a mortgage receivable on its books and records due from Seneca in the amount of $25,000. [10] This mortgage resulted from the sale of half the Preston farm (20 acres) by CCP to Seneca on April 16, 1961. The Preston farm was purchased on April 15, 1961, by CCP from Stonehedge. *251 Neither Stonehedge nor Seneca paid CCP any interest on their respective mortgages during the taxable years 1970, 1971, or 1972. Due to Stonehedge's development problems, Seneca was unable to realize revenue from anticipated tap-ins. During the taxable years 1970, 1971, and 1972, CCP had loans due from Stonehedge (in addition to the mortgage loans discussed supra) on which no interest was charged or paid in the following amounts: 1970
Balance
Balance 1/1/70
$120,000
Balance 12/31/70
(repaid 10/29/70)
0
1971
Balance 1/1/71
0
Advance 6/21/71
$6,000
$ 6,000
Advance 7/20/71
6,000
12,000
Advance 8/10/71
4,000
16,000
Advance 10/23/71
4,000
20,000
Advance 11/24/71
3,000
23,000
Balance 12/31/71
23,000
1972
Balance 1/1/72
$23,000
Balance 12/31/72
23,000
These loans resulted from advances to Stonehedge in order to keep the corporation going and to meet priority obligations on first mortgages. On or about November 12, 1968, the State of New York acquired by eminent domain a portion of the Seneca Knolls farms property. Stonehedge rejected the state's offer of $52,300 for the property (on which a partial payment had been *252 made in 1969). The condemned property had a cost basis of $130,138. On January 26, 1970, Stonehedge filed a claim against the State of New York for $2,000,000; $1,000,000 in direct damages and $1,000,000 consequential damages.It expected to realize $600,000 to $700,000 on this claim.By judgment entered May 16, 1973, the Court of Claims of the State of New York determined that Stonehedge was entitled to $245,399 for the parcel taken by the State. The total amount paid Stonehedge, including interest, was $294,032.91, of which $39,225 had been received as a partial payment in 1969.
In 1970, Stonehedge assigned its anticipated award from the State as security for a $500,000 loan to be used to develop land in Van Buren from the Merchants National Bank and Trust Company of Syracuse (Merchants Bank). The loan was also secured by mortgages on two farms and the personal quarantees of Peter and Rocco, which Merchants had considered insufficient collateral without the assignment of the claim against the State. Interest was payable at 1-1/2 percent over the prime rate. Merchants Bank made this loan, in part, in anticipation of receiving mortgage applications from the purchasers of units *253 from Stonehedge and its affiliated corporations. Had it known, however, that only $254,807.91 would be received from the State for the assigned claim, it probably would not have made the loan. Prior to the pledge of Stonehedge's potential claim against the State to Merchants Bank, it was not otherwise pledged, assigned, or made the subject of a security interest. On March 14, 1972, Stonehedge sold approximately 115 acres of land in the Seneca Knolls farms tract and paid CCP the $223,756 proceeds of the sale. [11] This money was used to reduce the principal of CCP's mortgage on the property (the partial release of which was a precondition to the sale), after which $899,094 of mortgage principal remained outstanding. On or about March 14, 1972, Stonehedge gave CCP a deed in lieu of foreclosure of the CCP mortgages for the Henderson farm and the remainder of the *254 Seneca Knolls tract. CCP took ownership of the properties in full satisfaction of its mortgages. CCP realized a gain of $482,577 on its reacquisition of the properties from Stonehedge. Stonehedge's balance sheets for the years ending December 31, 1970, 1971, and 1972 reflected the following: 1970
1971
1972
ASSETS
Current assets
[12] $ 303,836 $ 16,230
$ 13,285
Equipment (less
depreciation)
4,995
3,496
26,145
Land (at cost)
1,338,654
1,338,797
200,175
Due from Seneca
71,950
68,950
69,350
Seneca mortgage
10,000
10,000
10,000
Total Assets
$1,729,435
$1,437,473
$318,955
LIABILITIES AND
STOCKHOLDERS' EQUITY
Current liabilities
$ 90,174
$ 116,348
$174,500
Mortgages payable
1,146,152
1,142,101
9,249
Merchants' Bank loan
[13] 496,000 [14] 472,000 306,000
Other liabilities
57,416
66,385
90,397
[15] Common stock [15] 8,357 [15] 8,357 [15] 8,357 Retained earnings
(68,664)
(367,718)
(269,548)
Total Liabilities and
Stockholders' Equity
$1,729,435
$1,437,473
$318,955
1973
1974
ASSETS
Current assets
$ $
Equipment (less
depreciation)
Land (at cost)
Due from Seneca
Seneca mortgage
Total Assets
$ 4,819
$ 5,118
LIABILITIES AND
STOCKHOLDERS' EQUITY
Current liabilities
$ $
Mortgages payable
Merchants' bank loan
Other liabilities
15,908
15,847
[15] Common stock [15] 8,357 [15] 8,357 Retained earnings
(19,446)
(19,086)
Total Liabilities and
Stockholders' Equity
$ 4,819
$ 5,118
*255 The following table shows Stonehedge's earnings during the taxable years indicated as shown on its financial statements and/or tax returns: [16]
Gross profit or loss
Net earnings (or loss)
Year
from sales
Other Income
after provision for taxes
1967
$40,341.95
$ 4,216
$ 3,285
1968
(26,683.23)
6,269
(54,687)
1969
No sales listed
6,113
(35,948)
1970
No sales listed
1,175
(43,645)
1971
No sales listed
2,321
(299,054)
1972
No sales listed
1,245
[17] (39,563) 1973
No sales listed
[18] 254,708 9,779
1974
No sales listed
86
(125)
*256 The notes to the 1970 and 1971 financial statements' schedules of land and mortgages payable, referring to the Seneca Knolls farms, state: "It is the opinion of management that the market value of the land exceeds the stated amount of each mortgage." For the taxable years 1967, 1968, and 1969, the District Director of Internal Revenue, Buffalo, New York allocated interest on the mortgages given CCP by Stonehedge and Seneca, and on advances made by CCP to Stonehedge and to Cappy's Real Estate, Inc., another related corporation, pursuant to section 482. In 1975, this Court sustained respondent's allocation of interest, and its effect on the distributable partnership income of each of the partners, for those three taxable years. Our decision was affirmed by the United States Court of Appeals for the Second Circuit, and the Supreme Court denied certiorari. Paduano v. Commissioner, T.C. Memo. 1975-69, *257 affd. mem. 538 F.2d 312 (2d Cir. 1976), cert. denied 425 U.S. 992 (1976). The amounts of interest allocated for the taxable years 1967, 1968, and 1969 were $69,428.49, $68,134.93, and $64,070.31, respectively.
In its amended partnership return for 1975, signed August 13, 1976, after the Supreme Court denied certiorari, CCP claimed a bad debt deduction for the interest allocated for 1967, 1968, and 1969. The taxpayers then filed amended returns for 1975 and refund claims to carryback the net operating loss to the taxable year 1972. On June 13, 1975, the boards of directors of Stonehedge and Community Technology, Inc. (CTI), and their shareholders, [19] approved the merger of their corporations, together with PRG Enterprises, Inc., another related corporation, which owned all the shares of Village Green of Van Buren, Inc., into CTI. The purpose of this merger was to reduce costs by simplifying their operations.As originally planned, each entity was to serve a particular function, but in practice they began overlapping, complicating both their internal and external dealings. *258 On or about May 13, 1976, CTI filed a petition in the United States District Court for the Northern District of New York pursuant to Chapter XI of the Bankruptcy Act, coincident with Peter's and Rocco's filing under Chapter XII of the Bankruptcy Act. The primary purpose of filing all three petitions was to renegotiate the secured indebtedness of Peter, Rocco, and CTI. In its Statement of Affairs filed with the Bankruptcy Court on June 11, 1976, CTI listed total property in the amount of $7,048,737.25, and total debts of $8,970,466.79. These debts, however, included one liability of $1,979,127 which was a mortgage debt against a project which had been conveyed subject to the mortgages, so the value of this property, $2,400,000, was not included as an asset of CTI. Another debt for $1,500,000 included on CTI's debt schedule was secured by certain phases of a project owned by Peter and Rocco, which had a market value in excess of $5,000,000 and was not otherwise encumbered; it, too, was not reflected in CTI's asset schedule. The secured indebtedness was successfully renegotiated. On or about October 6, 1977, the Bankruptcy Court approved a Plan of Arrangement with the unsecured *259 creditors providing for 100-percent payment of their claims by June 10, 1984. In addition, Peter and Rocco agreed to a subordination of their individual claims against CTI. In the course of the bankruptcy proceeding, CCP filed a proof of claim in the sum of $325,718.90 for interest allocated by respondent pursuant to section 482 for the period 1967 until March 1972. The Bankruptcy Court disallowed this claim because under New York law, no interest liability by CTI to CCP existed.The United States filed an amicus curiae brief in the Bankruptcy Court opposing CCP's claim on these grounds. ULTIMATE FINDINGS OF FACT CCP had a reasonable expectation that, if it had charged interest to Seneca during the taxable years at issue, such interest could have been paid during such years of within a reasonable time thereafter. CCP had a reasonable expectation that, if it had charged interest to Stonehedge during the taxable years at issue, such interest could have been paid during such years or within a reasonable time thereafter. At the time of the sale to Stonehedge, CCP held the Seneca Knolls and Henderson farms properties primarily for sale to its customers in the ordinary course *260 of its trade or business. The sale to Stonehedge took place on December 28, 1962. OPINION The parties have presented us with three issues to be resolved. Whether: (1) respondent's allocations of interest to CCP pursuant to section 482 [20] for the taxable years 1970, 1971, and 1972 should be upheld; [21] (2) CCP may deduct as a bad debt in either 1972 or 1975 the interest properly allocated to it for the years 1967, 1968, and 1969; and (3) the character of the gain to CCP upon its foreclosure of the mortgages on the Henderson and Seneca Knolls Farms. *261 Petitioners do not dispute the principle that where one member of a group of commonly controlled entities becomes indebted to another but is charged no interest, respondent may allocate interest to the creditor under section 482, if interest would have been charged under like circumstances in an arm's-length transaction. B. Forman Company v. Commissioner, 453 F.2d 1144 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912 (1970). Petitioners acknowledge that no interest was charged during the years in issue, but argue that (a) the corporations and partnership were not commonly controlled, and (b) since interest would not have been accrued under the circumstances by unrelated entities, respondent cannot allocate it under section 482. We find petitioners argument that the necessary control (under section 482) did not exist to be frivolous. They contend that when Paduano relinquished his stock interests in 1969, the common control also disappeared. Section 482 and regulations thereunder [22] clearly state that common control, direct or indirect, not common ownership, is all that is necessary. Charles Town, Inc. v. Commissioner, 372 F.2d 415, 419-420 (4th Cir. 1967), *262 affg. a Memorandum Opinion of this Court. The language is broad and sweeping, and is ample to cover the present case. Cf. Ach v. Commissioner, 42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966). We are to apply a realistic approach to the control question. B. Forman Company v. Commissioner, 453 F.2d at 1153.[23] Though there may have been a potential conflict of interest between Paduano and the Cappuccillis, because of the former's continued ownership of a one-third interest in the partnership, petitioners have demonstrated no actual conflict. [24] In fact, the only evidence presented indicates that Paduano had retired from active participation in CCP, thereby manifesting common direct control in Peter and Rocco over the entities. Even if the evidence had indicated a continuing active role for Paduano in CCP, we would find the necessary control.In failing to collect interest from Stonehedge and Seneca, CCP was merely continuing its practice established while Paduano was involved in the corporations. We have no evidence that Paduano attempted to change such practice, despite his new status *263 solely as a creditor of the corporations via the partnership, rather than as a shareholder, thereby indicating an acquiescence in the management decisions by Rocco and Peter. Petitioners have failed to convince us that the actual control of the partnership and the corporations was not exercised by the latter two individuals at all times during the taxable years 1970, 1971, and 1972. We, therefore, find the requisite control by the same interests. See also Grenada Industries, Inc. v. Commissioner, 17 T.C. 231, 253-254 (1951), affd. 202 F.2d 873 (5th Cir. 1953). In Dallas Ceramic Co. v. United States, 598 F.2d 1382 (5th Cir. 1979), Brittingham v. Commissioner, 66 T.C. 373, 395-400 (1976), affd. per curiam 598 F.2d 1375 (5th Cir. (1979), and Cedar Valley Distillery, Inc. v. Commissioner, 16 T.C. 870 (1951), relied upon by petitioners, the ownership involved was so disparate that the necessary common control under section 482 was found not to exist. These cases are clearly distinguishable. *264 It is clear that respondent may allocate interest to CCP in respect of its loans to the corporations even if the corporations did not realize income from the loans during the year. B. Forman Company v. Commissioner, supra; Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199 (1977). He is to make such allocation -- in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. * * * Ach v. Commissioner, 42 TC. at 125-126. [Citations omitted.] Petitioners argue that the financial status of Stonehedge and Seneca was such that, even if an adequate rate of interest had been charged (as presumably an unrelated third party would have done), *265 such interest would not have been accruable, because there was no reasonable expectation of collection during the taxable years at issue, and that, therefore, respondent was without power to allocate interest income to CCP in respect of those years. Respondent argues that he may apply section 482 to allocate interest income regardless of the debtor's ability to pay (see section 1.482-1(d)(4), Income Tax Regs.) and, in any case, that the financial condition of Stonehedge and Seneca were such that CCP had a reasonable expectation of collecting interest and, therefore, if an adequate interest had been charged, it would have been accruable. We deal first with the question as to whether an unrelated taxpayer or CCP (had it charged an adequate rate of interest) would have been required to report for tax purposes interest income during any of the taxable years at issue. Under the accrual method of accounting, income is includable in gross income when all the events have occurred which fix the right to receive such income and the amount can be determined with reasonable accuracy. Section 1.451-1(a), Income Tax Regs. Where, however, income is of doubtful collectibility or it is reasonably *266 certain that it will not be collected within a reasonable time after the taxable year, i.e., in the absence of "reasonable expectancy of its receipt," a taxpayer is justified in not accruing the item. Corn Exchange Bank v. United States, 37 F.2d 34 (2d Cir. 1930). The mere financial difficulty of the debtor or postponement of making payment does not constitute the requisite absence of reasonable expectancy of receipt. Harmont Plaza, Inc. v. Commissioner, 64 T.C. 632, 650 (1975), affd. by order 549 F.2d 414 (6th Cir. 1977). [25] The determination of whether CCP would have had a "reasonable expectancy" of collecting interest from Seneca and Stonehedge is a question of fact. Chicago & North Western Railway Co. v. Commissioner, 29 T.C. 989, 996 (1958). In approaching the question of "reasonable expectancy," we recognize that this involves an exception to the general rule of accruability and that it should be applied narrowly in order that the exception does not swallow up the rule itself. Cf. Georgia School-book Depository, Inc. v. Commissioner, 1 T.C. 463, 469 (1943). Furthermore, we recognize the problem *267 in examining cash flow in the context of leveraged real estate transactions such as Stonehedge engaged in (see Harmont Plaza, Inc. v. Commissioner, 64 T.C. at 650), a problem which is accentuated where related corporations and the consequent opportunity for manipulation are involved. We note initially that, as to Seneca, we have only Peter's self-serving and unsubstantiated testimony that it could not pay interest. Though petitioners filled the record with Stonehedge's tax returns and audited financial statements, the only documentation relating to Seneca was its corporate income tax returns for the fiscal years ending June 30, 1968, and 1969, years not involved herein. These returns show that, although Seneca operated at a loss during those years, it had substantial gross receipts, and there is no evidence that such flow of receipts did not continue during the taxable years 1970, 1971, and 1972 and that interest could not have been paid therefrom. [26] Petitioners have totally failed to carry their burden of proof ( Welch v. Helvering, 290 U.S. 111 (1933); *268 Rule 142(a), Tax Court Rules of Practice and Procedure). Accordingly, we uphold respondent's determination that CCP should have accured interest income due from Seneca during the years in issue. Cf. Bryan v. Commissioner, 281 F.2d 238, 243 (4th Cir. 1960), affg. in part and remanding 32 T.C. 104 (1959). The issue of "reasonable expectancy" as to Stonehedge is not as clear-cut. Throughout the taxable years 1970, 1971, and 1972, Stonehedge's real estate holdings were heavily leveraged. Based upon its tax returns and financial statements during such years, its liabilities far exceeded its assets, [27] it was unprofitable, and it had cash flow problems. But, Stonehedge received substantial amounts of cash during those years which, for aught that appears in the record herein, could have been used to pay interest had it been charged -- some $496,000 by way of loan from Merchants Bank and $223,756 from the sale of acreage to a third party. *269 Petitioners' arguments that the proceeds of the Merchants Bank loan could not have been used to pay interest had it been charged are not persuasive. We were not favored with any written evidence as to the terms of the $500,000 loan which would have revealed the restrictions, if any, on the use of funds advanced by the bank thereunder. Nor did the oral testimony of Gschwender (the loan officer of Merchants Bank involved with the loan to Stonehedge) enlighten us on this score. He merely testified that Merchants Bank would have loaned funds for the purpose of paying interest to CCP only on a subordinated basis and did not testify as to the conditions imposed by the bank on the loan actually made. We do not think that the evidence of record as to the collateral and guaranties which Merchants Bank required is sufficient to indicate whether any such restrictions existed, or the nature thereof.Nor were we favored with any evidence as to how the funds received from Merchants Bank were in fact used, although we presume they were used to pay operating expenses which, according to the financial statements, with minor exceptions, did not involve any construction or other direct costs of *270 developing Stonehedge's land. Similarly, no evidence was submitted to show the source of funds with which repayments were made to Merchants Bank. [28] In this connection, we note that in 1971 and 1972 the loan balance was reduced. Thus, we are not satisfied that the funds advanced by Merchants Bank could not have been used to pay interest to CCP during the taxable years at issue. Our position is reinforced by the fact that during 1970 Stonehedge repaid $120,000 of advances by CCP. Since Stonehedge had only a miniscule amount of income during that year, such repayment presumably was made from funds received from Merchants Bank on the theory that such advances were for the purpose of facilitating the development of Stonehedge's properties. The use of such advances to pay interest on CCP's mortgage (had it been charged) could presumably have been supported on the same basis, since the mortgages represented the proceeds of sales of land to Stonehedge for purposes of development. As far as the $223,756 is concerned, it appears that such payment was necessary to release *271 CCP's mortgage in order that the property in question could be sold. The funds were applied to the discharge of the principal of the mortgage; in fact, there was no reason for it to have been applied otherwise, since at the time of application, Paduano v. Commissioner, T.C. Memo. 1975-69, affd. mem. 538 F.2d 312 (2d Cir. 1976), cert. denied 425 U.S. 992 (1976), had not been decided to say nothing of the fact that the deficiency notices which gave rise to the Paduano case had not even been issued (they were issued in June 1972). Moreover, under New York law, such application would have been recognized as binding between the parties. Cf. Foss v. Riordan, 84 N.Y.S. 2d 224, 233-234 (West. Cty. 1947), affd. 273 App. Div. 982, 79 N.Y.S. 2d 515 (2d Dept. 1948), and cases cited thereat. See New england Waterworks Co. v. Farmers' L. & T. Co., 54 App. Div. 309, 66 N.Y.S. 811, 815 (1st Dept. 1900); Laney v. Whitaker, 91 Misc. 2d 949, 398 N.Y.S. 2d 839, 840 (Monroe Cty. 1977), citing Bank of California v. Webb, 94 N.Y. 467, 472 (1884). Moreover, respondent's own *272 regulations seem to recognize that payments are applied first to principal (at least in the absence of a contrary application by the parties) in outlining the method by which the time periods for computing allocated interest are determined. See section 1.482-2(a)(3), Income Tax Regs.Under these circumstances, we incline to the view that the $223,756 should not be considered as being available for the payment of the interest allocated in respect of the taxable years at issue. However, as we see it, there was still another source of funds which could have been available to pay interest had it been charged. CCP received $404,422 in October 1973 as proceeds from the sale of land. The record does not clearly reveal what land was sold. A part of it ($245,399) apparently was the principal proceeds of the State condemnation award, which for the reasons hereinafter stated (see p. 37, infra) we do not believe should be taken into account. The balance of the proceeds ($159,023) apparently came from other land which presumably was available for sale by Stonehedge at an earlier date. Stonehedge's 1973 return shows a cost of the land not involved in the condemnation award as $70,015 *273 which indicates that of the total gain of $204,224 reported -- a figure as to which we have been unable to construct a reconciliation on the basis of the record before us -- $89,008 ($159,023 less $70,015) was available to pay interest had it been charged. [29]
Based on the foregoing, Stonehedge would appear to have had at least $589,008 available (and possibly more, see footnote 29, supra) available cash funds during the taxable years at issue or within a reasonable time thereafter. Granted that it was reasonable to expect that some of these funds were needed for operations (although, as we have pointed out, no hard evidence on this score was forthcoming), there would still seem to have been enough which could have been used to pay interest had it been charged. The amounts of allocated interest to CCP from Stonehedge for the three years at issue herein aggregated only $129,339 (1970 -- $61,111; 1971 -- $56,564; 1972 -- $11,664). If we were to take into account the $196,380 of interest *274 allocated to CCP from Stonehedge for 1967, 1968, and 1969, [30] we would reach the same conclusion; the aggregate allocated interest for all six years (some $325,719) was still substantially less than the funds which appear to have been available, even after making some allowance for expenditures to cover operating costs. In sum, petitioners have simply not carried their burden of proof ( Welch v. Helvering, supra; Rule 142(a), supra) that there was not a "reasonable expectancy" that, had such interest been charged Stonehedge by CCP, it could not have been paid. [31]
Petitioners' argument that we should not take allocated interest into account because it was not clear, at least until *275 Paduano v. Commissioner, supra, was decided by this Court in 1975, that there was any liability for such interest is beside the point. The test we have applied is, not whether there was a "reasonable expectancy" of collectibility of allocated interest, but whether, if a third party (or CCP) had in fact charged interest in the amounts allocated by the respondent, such interest could have been reasonably expected to have been collected. See pp. 27-28, supra. Because we have concluded that respondent's allocation of interest to CCP for the taxable years at issue should be sustained for the reasons stated above, we do not reach respondent's arguments that we should hold that there was a "reasonable expectancy" of collectibility because Stonehedge had available unrealized appreciation in its real estate [32] and because of the availability, prior to its assignment to Merchants Bank, of the State condemnation award.[33] Similarly, we do not reach the issue as to whether, even if there was no reasonable expectancy of collectibility, respondent nevertheless had the power to allocate interest by analogy to the "creation of income" cases. See Latham Park Manor, Inc. v. Commissioner, 69 T.C. at 214-216, *276 and cases collected thereat; section 1.482-1(d)(4), Income Tax Regs. In this latter connection, we observe that the "creation of income" cases involved the question whether it was material to the existence of respondent's power to allocate income under section 482 that funds represented by non-interest-bearing loans were used to produce income (in which context, the Court of Appeals in B. Forman Company v. Commissioner, supra, rejected the standard of correctness "from a pure accounting standpoint" and held that section 482 could be utilized, see 453 F.2d at 1156), whereas, in the instant case, had we found no reasonable expectancy of collectibility, our analysis would have started from the premise that respondent had the power to "create" income under section 482 and would then have proceeded to deal with the question whether the interest income so created should have been included in CCP's income even though an independent third party (or CCP) would not have been required to report such interest had it been charged, [34] a question not faced in the "creation of income" cases. [35]
*277 The next issue to be resolved is whether petitioners are entitled to a bad debt deduction in either 1972 or 1975 for the interest respondent successfully allocated to CCP under section 482 for the years 1967, 1968, and 1969 (see Paduano v. Commissioner, supra.) Petitioners argue that the "debt" became worthless in either 1972 or 1975. Their 1972 claim is based upon B. Forman Company v. Commissioner, supra, the first case upholding respondent in his allocation of interest on non-interest-bearing loans under section 482, being decided in that year, including the denial of a petition for certiorari (407 U.S. 934 (1972)) and a rehearing thereon (409 U.S. 899 (1972)), and their receipt in that year of the deficiency notices for 1967, 1968, and 1969. Their alternative claim for 1975 rests on the fact that in that year, we decided Paduano v. Commissioner, supra, upholding respondent's allocation of interest from Stonehedge and Seneca. For the reasons which follow, we hold that if a "debt" was created, it did not come into existence until 1976. It is well-settled that a debt does not exist for *278 purposes of section 166 where the obligation to repay is subject to a contingency which has not occurred. Lieberfarb v. Commissioner, 60 T.C. 350, 354 (1973); Ewing v. Commissioner, 20 T.C. 216, 229 (1953). The obligation of the petitioners' in Paduano v. Commissioner, supra, to pay the tax on the allocated interest was contingent on both our decision and its affirmance on appeal. Blake v. Commissioner, 67 T.C. 7, 18-20 (1976), and cases discussed thereat, affd. as to this issue 615 F.2d 731, 736 (6th Cir. 1980); North American Coal Corporation v. Commissioner, 28 B.T.A. 807, 851 (1933). Cf. United States v. Consolidated Edison Co., 366 U.S. 380 (1961); Lucas v. American Code Co., 280 U.S. 445 (1930). See sections 6215 and 7485. See generally, 2 Mertens, Law of Federal Income Taxation (Malone Rev. 1974) sec. 12.66, pp. 267-269. Petitioners argue that the requirements of section 7485 and Rule 192, Tax Court Rules of Practice and Procedure, that the filing of a notice of appeal does not stay assessment or collection of the deficiency determined *279 by this Court unless a bond is filed with this Court, remove the contingency. We disagree. We think it a fair assumption that their appeal of the Paduano decision was in good faith and not a dilatory tactic. See section 7482 (c)(4). Thus, we will not now hear petitioners argue that they did not believe their tax liability was in dispute and subject to a real contingency in 1975. Similarly, since the tax liability was contingent until 1976, a debt for it could not have been in existence in 1972. Petitioners' argument that the debt arose in that year because the deficiency notice was "presumptively correct," is clearly without merit. [36]
Thus far, the discussion has centered on the petitioners' *280 tax liability in Paduano v. Commissioner, supra, whereas we are concerned herein with the underlying interest liability. That interest obligation, however, was the alter ego of the tax liability; the allocation of interest was contingent on our tax decision. Had we, or an appellate court, decided in favor of the petitioners in Paduano, there would have been no allocation of interest, nor any question as to whether it was a valid and enforceable obligation. Until the decisions were final, therefore, the interest liability (if it ever were to legally arise) was subject to a contingency which had not yet occurred. It is analogous to the situation in which the tax liability is contingent on when the underlying claim is finally resolved. E.g., Dixie Pine Co. v. Commissioner, 320 U.S. 516 (1944) (all events have not occurred where liability is contingent and in contested by taxpayer). [37]
*281 We turn now to the final issue, i.e., the character of the gain recognized by CCP pursuant to section 1038 (b)(1), upon the foreclosure of the mortgages on the Seneca Knolls and Henderson farms in 1972. [38] The characterization of the gain as ordinary or capital is controlled by the circumstances of the original sale. Section 1.1038-1(d), Income Tax Regs. Thus, we must decide whether the Seneca Knolls and Henderson farms were capital assets within the meaning of section 1221 in CCP's hands, when originally sold to Stonehedge.
Section 1221(1) denies capital gain treatment to gains arising from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The purpose of this provision "is to differentiate between 'the profits and losses arising from the everyday operation of a business' on the one hand * * * and 'the realization of appreciation in value accrued over a substantial period of time' on the other, * * *." Malat v. Riddell, 383 U.S. 569, 572 (1966). The ultimate determination is a factual one, to be based on all the *282 surrounding circumstances. Adam v. Commissioner, 60 T.C. 996, 999 (1973). Rather than list the factors deemed relevant by the courts (see e.g., Gault v. Commissioner, 332 F.2d 94, 96 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Adam v. Commissioner, supra), we shall only discuss those relevant to our decision herein. The relationship among the factors and their mutual interaction changes in each case depending on the facts. Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976). The focus of the factual inquiry is the statutory tests, i.e., (1) what was CCP's trade or business? (2) was CCP holding the property primarily for sale in the ordinary course of its trade or business, and (3) was Stonehedge a customer of CCP in that trade or business? Cf. Suburban Realty Co. v. United States,615 F.2d 171, 178 (5th Cir. 1980). Petitioners argue that CCP and Stonehedge were separate taxable entities, as were the partner/shareholders, so that the activities of each should not be attributed to the others. See Gordy v. Commissioner, 36 T.C. 855 (1961). *283 They then argue that CCP merely acquired the individual farms as a speculative investment, assembling enough contiguous parcels to make it worthwhile for a purchaser to seek a zoning change. They claim that CCP undertook no other activity to rezone, subdivide, or otherwise improve the land, nor any sales activities. In addition, they deny that CCP was in the trade or business of selling land, claiming that its real estate transactions were few and isolated. [39]
The developers were careful, on paper, to separate their activities and those of Stonehedge from the partnership's, but that is where the separation ended. CCP cannot be permitted to insulate itself from the acts of an entity (Stonehedge) whose efforts are so closely related to its own; [40] the supplier of developable land may be regarded as a joint participant with the builder in an integrated real estate development business. Bauschard v. Commissioner, 31 T.C. 910, 916-917 (1959), affd. 279 F.2d 115, 118 (6th Cir. 1960). Cf. Pointer v. Commissioner, 48 T.C. 906, 917 (1967), *284 affd. 419 F.2d 213, 216 (9th Cir. 1969). Peter explained the role each entity played in their development plan. The jointness of the venture may be seen from how the land sales were structured -- no interest was actually charged on either the Henderson or Seneca Knolls mortgages, repayment was scheduled over several years as the land was expected to be developed and resold, delivery of the deed was held up until the principals believed (incorrectly) that the zoning would be approved, and essentially all of the risk of non-development fell on CCP, which apparently expected no payment until the buildout had proceeded and did not foreclose until it had abandoned its development plan, at least with respect to the use of Stonehedge. [41] In this context, we hold that CCP was in the trade or business of land development and sales at the time the Seneca Knolls properties were sold. *285 From the record, it is clear that CCP acquired and held the farms intending to resell them to Stonehedge. [42] These contiguous parcels lay between the already completed sections of Seneca Knolls and were included in Stonehedge's master plan of development which had been previously filed with the Town of Van Buren. Furthermore, we have found that the developers' method of operation was to have CCP acquire the land and Stonehedge develop it. The fact that the sale here was to one customer does not prevent characterization of the gain as ordinary income. Pointer v. Commissioner, 48 T.C. at 917. [43] Thus, the sale was of land primarily held for sale to a customer in the ordinary course of CCP's trade or business. The gain reported by CCP on the foreclosure of the mortgages is, therefore, taxable to CCP and through it to petitioners as ordinary income. [44]
*286 Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Dorothy Cappuccilli, docket Nos. 2097-77 and 2207-77; Grace Cappuccilli, docket No. 2208-77; and Gerald F. and Caroline Paduano, docket Nos. 5255-77, 5801-77.↩
2. In his preliminary statement on brief, respondent states that these consolidated cases are also for the redetermination of an overpayment of income tax of the petitioners for 1975 in the following amounts: Grace Cappuccilli, $1,460; Dorothy Cappuccilli, $2,815; and Gerald F. and Caroline Paduano, $1,072.↩
3. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue.↩
4. ↩
Date of
Purchase
Existing
Interest
Farm
Purchase
Price
Mortgage
per annum
Walter
2/22/61
$ 64,065
$54,000
4 percent
Commane
10/20/61
71,830
51,830
5 percent
Green
10/26/61
34,788
24,690
5-1/2 percent
Patterson
11/24/61
22,400
18,650
0 percent
Higgins
1/ 3/62
127,000
84,000
5 percent
42,000
5 percent (Hunt)
5. Cerio was the attorney for CCP, Stonehedge, and Seneca, as well as Peter, Rocco, and Paduano. ↩
6. CCP and Stonehedge were both operated out of the same office, as were various other enterprises of the Cappuccillis and Paduano.↩
7. No separate contract of sale of the farms to Stonehedge is in evidence.↩
8. These figures are not available in the record. ↩
9. There is no explanation in the record as to how the mortgage balance went from $1,052,850 on 12/31/71 to $1,010,972 on 1/1/72, only one day later.↩
10. It is not clear from the record whether this note bore interest, or at what rate, because the exhibit which the parties stipulated to be the note is, in fact, the mortgage note from Stonehedge to CCP on the Henderson farm. Petitioners' brief indicates the note called for six percent interest, as does the testimony.↩
11. The two purchasers, PRG Enterprises, Inc., and the Village Green of Van Buren, Inc., were corporations related to Stonehedge and CCP. The date of March 14, 1972, is stipulated by the parties, although the foreclosure document states that these two entities were conveyed land in deeds dated December 30, 1971.↩
12. This includes $250,000 due from two affiliated companies, Stevemark Realty Corp. and Cappy's of Syracuse, Inc., of which $240,324 was written off as uncollectible in 1971. ↩
13. Of this amount, $104,000 was due within one year. ↩
14. Of this amount, $24,000 was due within one year. ↩
15. Stonehedge originally issued at par 180 out of 200 authorized shares of $100 par value common stock. Paduano's shares were purchased by the corporation in 1969 for $9,643.22 and held as treasury stock. It is the net of these figures, $8,357, which is reflected as shareholders' equity in common stock.↩
16. For 1973, the financial statement covers only the five-month period ending May 31, whereas the tax return covers the entire year.↩
17. The statement of earnings reflects a capital gain of $137,733.16, presumably from the foreclosure, which, under the circumstances, represents no cash receipts. ↩
18. Includes $48,634 in interest in respect of the condemnation award and $204,224 reported as long-term gain, the source of which was not identified.↩
19. In addition to Peter and Rocco, one Alfred Cappuccilli was also a shareholder and director of CTI.↩
20. The interest was allocated in respect of the Stonehedge and Seneca mortgages under section 482 rather than section 483 because the sale to Stonehedge occurred prior to July 1, 1963. With respect to the Seneca mortgage, even if it bore interest at six percent (see footnote 10, supra) such interest was not paid (nor does the record reveal that CCP reported any such interest on its tax returns for the years at issue) and, in any event, petitioners make no separate argument with respect to respondent's use of a five-percent rate in making his allocation. Cf. Liberty Loan Corporation v. United States, 498 F.2d 225, 231-232↩ (8th Cir. 1974). 21. Petitioners concede that if interest is properly allocable to CCP under the circumstances herein, the rate utilized by respondent is appropriate. Respondent has allowed Stonehedge and Seneca additional interest deductions for the years in issue in amounts equal to the interest income which he has allocated to CCP under section 482. Section 1.482-1(d)(2), Income Tax Regs.↩
22. Section 1.482-1(a)(3)↩.
23. Since the business entities involved herein are Stonehedge and Seneca, on the one hand, and the CCP partnership on the other, we are not required to decide whether we will accept the full import of the reversal of our holding in F. Forman Company v. Commissioner, 453 F.2d 1144 (2d Cir. 1972), affg. in part and revg. in part 54 T.C. 912↩ (1970). 24. Petitioners' argument that "it should be obvious that Paduano was looking forward to having CCP collect its mortgage obligations, including interest, from Stonehedge and Seneca," is ludicrous. CCP had no enforceable right to collect interest from Stonehedge on its mortgage loan under New York law. New York State Thruway Authority v. Hurd, 25 NY 2d 150, 158, 303 N.Y.S. 2d 51, 56 (1969). Moreover, he was well aware that CCP had not been collecting interest from either corporation. Paduano's explained absence from the trial means, at most, that his failure to testify will not be held against petitioners (see Snyder v. Commissioner, T.C. Memo. 1969-173↩), not that they may speculate as to what such testimony might have been.
25. See also IDI Management, Inc. v. Commissioner, T.C. Memo. 1977-369↩.
26. See Merit Tank and Body, Inc. v. Commissioner, T.C. Memo. 1980-175↩.
27. On its balance sheet of December 31, 1970, current assets exceeded current liabilities. The current assets, however, included $250,000 in accounts receivable from related corporations, of which $240,324 was written off as uncollectible in 1971. See footnote 12, supra↩.
28. The loans from Merchants Bank aggregated $472,000 at the end of 1971 and $306,000 at the end of 1972.↩
29. For aught that appears in the record, this land may well have been held free of encumbrances by Stonehedge so that the full $159,663 proceeds from its sale could have been so available.↩
30. The remaining $5,254 ($201,634 less $196,380) allocated for these years involved other entities and need not be considered.↩
31. We reach this conclusion on the basis of a "preponderance of the evidence" standard of proof and, therefore, do not reach the question whether, because section 482 is involved, a higher standard of proof, i.e., that respondent's determination was arbitrary, is required of petitioners on the subsidiary issue of reasonable expectancy.↩
32. At trial, because of the manner in which the evidence was developed, the Court stated that, in any event, it was not disposed to deal with this issue. ↩
33. We note that this argument has an aura of incongruity, since the amount, if any, which Stonehedge would receive beyond the $13,075 excess over what the State had paid in 1969 was highly speculative; the final award of $245,399 was not made until May 16, 1973, well after the close of the last taxable year involved herein. ↩
34. See Pitchford's, Inc. v. Commissioner, T.C. Memo. 1975-75, where respondent conceded solely for the purposes of that case that section 482 should not be applied under such circumstances -- a conclusion which he now characterizes as "inopportune." Section 1.482-1 (b)(1), Income Tax Regs., provides: (b) Scope and purpose. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer↩. [Emphasis added.] 35. Respondent's reliance on Hennessey v. Commissioner, T.C. Memo. 1977-122↩, is also misplaced. In that case, we found that Hennessey had a reasonable expectation of collecting interest payments and, therefore, did not have to face this issue. Our passing reference to the fact that the question of reasonable expectation of collectibility is "not entirely distinct from their creation of income argument" is too thin a reed to support respondent's contention.
36. The effect of the deficiency notice is to place the burden of proof on the issues raised therein on the petitioners. Many petitioners are able to carry this burden, although the petitioners in Paduano v. Commissioner, T.C. Memo. 1975-69, affd. mem. 538 F.2d 312 (2d Cir. 1976), cert. denied 425 U.S. 992 (1976), were not. See generally, Llorente v. Commissioner, 74 T.C.     (May 13, 1980) (Tannenwald, J↩., concurring).
37. If a debt was not created, petitioners may be entitled to a loss. See Tharp v. Commissioner, T.C. Memo. 1972-10. See also Corn Exchange Bank v. United States, 37 F.2d 34, 35 (2d Cir. 1930). Our findings regarding the proper taxable year apply to this issue, as well. Section 1.165-1(d)(1), Income Tax Regs.↩
38. Petitioners concede that the amount of said gain is $482,577.↩
39. Petitioners do not question that Stonehedge was holding property for sale to customers in the ordinary course of its trade or business.↩
40. See and compare Bush v. Commissioner, T.C. Memo. 1977-75, affd. 610 F.2d 426↩ (6th Cir. 1979). 41. While Merchants Bank anticipated repayment from the "buildout," it also required a minimum payment schedule and did not offer this entire package of benefits.↩
42. Even with our finding that certain of the properties were not sold to Stonehedge until December 28, 1962 (see footnote 43, infra↩), the sales of the parcels involved herein to Stonehedge by CCP took place within a short period of time after their acquisition by the latter -- the longest period CCP held any such parcel was from February 2, 1961 to December 28, 1962, less than two years. 43. Our ultimate finding of fact as to the date of the sale by CCP to Stonehedge (see p.21, supra↩) has been included solely in the interests of completeness. In light of our conclusion, the holding period of CCP has no effect on the character of the gain therefrom.Moreover, also in the interest of completeness, we note that we have taken into account, in making our finding of fact, certain admissions against interest revealed in the record. 44. See also Bush v. Commissioner, supra↩, footnote 40.