**MAXUS ENERGY CORPORATION AND SUBSIDIARIES, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 93–5005.**

United States Court of Appeals, Federal Circuit.

July 29, 1994.

Thornton Hardie, III, Thompson & Knight, Dallas, TX, argued, for plaintiff-appellant.

Charles Bricken, Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief were James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen and Richard Farber.

Before COWEN, Senior Circuit Judge, and, MAYER and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a tax case. The Internal Revenue Service (IRS) determined that deductions, taken in 1984 and 1985 by a manufacturer of the Agent Orange chemical defoliant based on a settlement of claims brought by Vietnam veterans for injuries allegedly arising from exposure to Agent Orange, were improper. Maxus Energy Corporation (Maxus) and subsidiaries sought relief in the Court of Federal Claims.[1] That court, after granting partial summary judgment, then dismissed pursuant to a joint stipulation of the parties the complaint seeking a refund of taxes paid in the 1974 and 1975 taxable years based on a carry back of the 1984 and 1985 deductions. Slip op., No. 4–89 T (Ct.Fed.Cl. Sept. 3, 1992). We vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

The events that led to this appeal are somewhat convoluted, and require that they be given in considerable detail in order to make the issues understandable. Maxus and its subsidiaries (the Group) are an affiliated group of corporations which files its tax returns on a consolidated basis. Diamond Shamrock Chemicals Corporation (Diamond) is a member of the Group. During the Viet-

---

**1.** The Claims Court was renamed the Court of Federal Claims pursuant to § 902 of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, 4516 (1992), effective October 29, 1992.

nam War era, Diamond was a manufacturer of the Agent Orange chemical defoliant.

The Group reports its income and expenses using the accrual method of accounting. In 1984 and 1985, respectively, the Group reported deductions of $23,254,217 and $85,200. These amounts reflected expenses which had allegedly accrued to Diamond in 1984 and 1985 through an agreement it had entered into in 1984. In that agreement, Diamond settled class action claims brought against it and other class action defendants in 1979 by Vietnam veterans alleging injuries arising from exposure to Agent Orange.[2] Pursuant to that settlement agreement, Diamond agreed to contribute $21,667,347 (out of a total of $180,000,000) to a court administered settlement fund established by Judge Weinstein of the United States District Court of the Eastern District of New York. *In re Agent Orange Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984), *aff'd,* 818 F.2d 145 (2d Cir. 1987), *cert. denied sub nom. Pinkey v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). Pursuant to court order, Diamond was not required to immediately transfer the prescribed amount. Instead, it was allowed to transfer the prescribed amount plus accrued interest within 10 days of the date the court approved the settlement agreement.[3] However, Diamond was required to transfer, by July 2, 1984, a letter of credit, bond, or other acceptable instrument sufficient to secure its payment of the prescribed amount.

To fulfill its obligation of securing the prescribed payment, Diamond executed on July 2, 1984 with Mellon Bank (Mellon) an irrevocable standby letter of credit in favor of the clerk of the court, the designated custodian of the settlement fund. The amount secured by the letter was $22,807,372, and the expiration date of the letter was September 14, 1984. In that letter, Mellon undertook to meet Diamond's obligations with respect to the settlement fund in the event of Dia-

mond's default. In addition, the letter obligated Diamond to repay Mellon any amount Mellon expended pursuant to the letter. To secure Diamond's repayment obligations, the letter provided Mellon with a security interest in, a lien on, and a right of set-off against Diamond's deposit accounts with Mellon. The amount secured by the letter was subsequently increased to $23,630,800 during 1984 to reflect the accrual of interest. In addition, the expiration date was extended to January 15, 1985.

The settlement agreement provided that any class action defendant, who in its discretion believed that the number of plaintiffs who had opted out of the class was substantial, could withdraw from the agreement no later than 20 days before the date of the first public hearing scheduled for the purpose of certifying the class pursuant to Fed.R.Civ.P. 23. On June 11, 1984, the court scheduled such a hearing for August 8, 1984. Thus, the deadline for a defendant to withdraw from the agreement became July 19, 1984.

On January 7, 1985, the court issued an order approving the settlement agreement. Consequently, Diamond's payment obligation to the fund became due within 10 days of this date. In satisfaction of this obligation, Diamond, on January 14, 1985, paid $23,339,417 to the fund. The increase relative to the original $21,667,347 figure reflected the interest that had accrued since the date of the settlement agreement. The $23,254,217 deduction taken in 1984 represented that portion of the total of $23,339,417 which allegedly accrued in 1984; the $85,200 deduction taken in 1985 represented the residual portion of the total which allegedly accrued in 1985.

On June 2, 1987, the Group filed with the IRS refund claims for the 1972–1975 taxable years. The claims for the 1974 and 1975 years were based in part on carrying back, pursuant to I.R.C. §§ 172(b)(1)(I)–(j) (1988), the $23,254,217 and $85,200 deductions the

---

**2.** For background on the manufacture of Agent Orange and the litigation it spawned, see this court's opinions in *Hercules, Inc. v. The United States,* 24 F.3d 188 (Fed.Cir.1994).

**3.** The agreement provided that it would be null and void unless the court approved it as a fair, reasonable, and adequate settlement.

Group had reported in 1984 and 1985.[4] On October 26, 1988, and April 14, 1989, respectively, the IRS denied the refund claims.

In the action that gave rise to this appeal, the Group, on January 4, 1989, filed suit in the Court of Federal Claims against the United States asserting its refund claims for the 1972–1975 taxable years. On October 2, 1990, the parties filed with the court a set of stipulated facts. One such stipulated fact which is at issue in this appeal is the stipulation that the letter of credit issued by Mellon was "collateralized."

On February 21, 1991, the government filed a motion for partial summary judgment seeking a ruling that the Group was not entitled as a matter of law to the portions of the 1974 and 1975 refund claims which arose from the $23,254,217 and $85,200 deductions taken in 1984 and 1985 respectively. On July 11, 1991, the court issued an opinion granting the government's motion.

In its opinion, the court first analyzed whether the deductions were proper on the basis of the execution on July 2, 1984 of the letter of credit. At that time, under applicable law, an accrual basis taxpayer was allowed to deduct expenses incurred in satisfaction of a contested liability provided (1) the taxpayer transferred money or property in satisfaction of the contested liability, (2) the transfer was beyond the control of the taxpayer, and (3) but for the fact that the liability was contested, the liability of the taxpayer was fixed. The court concluded that the execution of the letter of credit did not meet these requirements for two reasons. First, according to the court, the letter of credit was not, contrary to the parties' stipulation, fully collateralized; thus, any purported "transfer" arising from that event was not beyond the control of Diamond. Second, but for the fact the liability was contested, Diamond's liability was not fixed on July 2nd because it had until July 19, 1984 to withdraw from the settlement agreement.

The court next analyzed whether the extinguishment on July 19, 1984 of Diamond's option to withdraw from the settlement agreement provided the necessary basis for the deductions. The court concluded it did not because by that date, the applicable law had changed. As the trial court saw it, under the law then in effect, an accrual basis taxpayer could not deduct an expense in relation to a contested tort liability prior to the date when disbursement was made to the individual tort claimants unless payment was made to a "designated" settlement fund. Since the fund in question is not a "designated" fund[5], and since the individual claimants of that fund were not paid by the date in question, the extinguishment of Diamond's option to withdraw from the settlement agreement likewise did not support the deductions.

The parties then reached a settlement on the remaining issues in the case. Specifically, the government granted the portion of the Group's 1974–1975 refund claims that were based on deductions other than those at issue in this appeal, and it granted in their entirety the Group's 1972–1973 refund claims. Accordingly, the parties, on June 30, 1992, filed with the trial court a stipulation dismissing with prejudice all the remaining claims in the Group's complaint except one: The Group's claims were dismissed *without* prejudice "as to any adjustments to carrybacks from other taxable years." According to undisputed evidence submitted by the Group's counsel of record, the exception was included at the government's insistence to protect it in the event it was later determined that the net operating loss carrybacks which formed the basis of the refunds it had granted had been erroneously computed. In that event, the government wanted to be able to recover the refunds from the Group.

On July 21, 1992, the court entered judgment dismissing the Group's complaint, but without specifying that certain claims were dismissed with prejudice and others were

4. Pursuant to I.R.C. § 172(j), the deductions are "product liability losses." Under I.R.C. § 172(b)(1)(I), product liability losses are net operating losses which can be carried back to each of the 10 taxable years preceding the loss year.

5. Under applicable law, a taxpayer must timely elect designated status. It is undisputed that the Group did not do so in relation to the fund in question.

dismissed without prejudice.[6] The parties then filed on August 4, 1992 a joint motion to amend the judgment. The motion was labelled as a Rules of the United States Court of Federal Claims (RUSCFC) 60(a) motion.[7] Pursuant to the joint motion, the court, on September 3, 1992, entered an amended judgment which reflected the court's July 11, 1991 order, as well as the distinction set out in the joint stipulation. The Group then filed on September 22, 1992, a notice of appeal to this court. The government filed a cross-appeal alleging that the Group's notice of appeal was untimely, and thus that this court lacks jurisdiction over the Group's appeal.

## DISCUSSION

### 1.

■ We first address the jurisdictional issue. The government argues that the August 4, 1992 joint motion to amend the July 21, 1992 judgment did not seek any substantive change in that judgment. Thus, the government further argues, it was properly characterized as a RUSCFC 60(a) motion which, pursuant to Fed.R.App.P. 4(a)(4) (1992)[8] (made applicable to the Court of Federal Claims by 28 U.S.C. § 2522 (1988)), did not toll the time for filing an appeal. Since the 60 day period prescribed by Fed.R.App.P. 4(a)(1) for filing the appeal thus had expired by the time the Group filed its notice of appeal, argues the government, this court lacks jurisdiction to entertain the appeal.[9]

The Group, by contrast, argues that the August 4, 1992 joint motion to amend did seek a substantive change in the July 21, 1992 judgment and thus is properly characterized as RUSCFC 59(d) motion.[10] Thus, the Group further argues, pursuant to Fed.R.App.P. 4(a)(4) (1992), that motion tolled the running of the time for filing an appeal until September 3, 1992, the date of the amended judgment. Since the notice of appeal was filed within 60 days of that date, argues the Group, this court has jurisdiction to entertain the appeal.

■ The Group is correct. The universal rule is that, regardless of its label, any motion made within ten days of entry of judgment which seeks a substantive change in the judgment will be considered a Fed.R.Civ.P. 59(e) motion. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1562, 30 USPQ2d 1001, 1004 (Fed.Cir.1994); *see also* 6A James W. Moore et al., *Moore's Federal Practice*, ¶ 59.12[1], at 59–265 (2d ed. 1994). The legal standard for determining whether a change is "substantive" is a practical one— whether the motion seeks a revision which disturbs or revises legal rights and obligations that were settled by the previous judgment. *St. Paul Fire & Marine Ins. Co. v. Continental Casualty Co.*, 684 F.2d 691, 693 (10th Cir.1982) (citing *F.T.C. v. Minne-*

---

**6.** The July 21, 1992 judgment merely stated that "the complaint is dismissed."

**7.** RUSCFC 60(a) provides in relevant part:

(a) **Clerical Mistakes.** Clerical mistakes in judgments ... and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.

**8.** A RUSCFC 60(a) motion is analogous to a Fed.R.Civ.P. 60(a) motion. Under Fed.R.App. 4(a)(4) (1992), only Fed.R.Civ.P. 59(e) motions (analogous to RUSCFC 59(d) motions) toll the time for filing an appeal:

(4) If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party ... under [Fed.R.Civ.P. 59(e)] ..., the time for appeal for all parties shall run from the entry of the order ... granting or denying ... such motion....

In 1993, the rule was amended to provide that Fed.R.Civ.P. 60 motions filed within ten days of the entry of judgment also toll the time for filing an appeal. *See* Fed.R.App.P. 4(a)(4)(F) (1993). This amendment has no applicability to this case, since the notice of appeal was filed before the effective date of the amendment (June 1, 1993).

**9.** The time period for filing an appeal prescribed by Fed.R.App.P. 4(a)(1) is "mandatory and jurisdictional." *Browder v. Director, Ill. Dep't of Corrections*, 434 U.S. 257, 264, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978) (quoting *United States v. Robinson*, 361 U.S. 220, 229, 80 S.Ct. 282, 288, 4 L.Ed.2d 259 (1960)).

**10.** RUSCFC 59(d) provides:

(d) **Motion To Alter or Amend a Judgment.** A motion to alter or amend the judgment shall be filed not later than 10 days after entry of the judgment.

It is identical to Fed.R.Civ.P. 59(e), the rule referred to in Fed.R.App.P. 4(a)(4) (1992).

*apolis–Honeywell Regulator Co.,* 344 U.S. 206, 212, 73 S.Ct. 245, 249, 97 L.Ed. 245 (1952)). Included are revisions which seek to resolve genuine ambiguities in the prior judgment. *Id.*

The parties' joint motion to amend met this standard. It was filed within ten days of the entry of judgment (excluding intervening Saturdays and Sundays pursuant to RUSCFC 6(a)). And it sought (and obtained) changes in the substantive rights of the parties. The July 21, 1992 judgment (which was effective at the time the motion was filed) is silent on the question of whether the dismissal was with prejudice:

> Pursuant to the opinion of July 11, 1991, and the stipulation for partial dismissal filed June 30, 1992,
>
> IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed.

Under RUSCFC 41(a)(2), which applies to *voluntary* dismissals made upon order of the court, the effect of the order was to dismiss the complaint *without prejudice.* RUSCFC 41(a)(2) provides in relevant part: "Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice." RUSCFC 41(a)(2). The government, however, argues that a different rule, RUSCFC 41(b), is governing. Unlike RUSCFC 41(a)(2), RUSCFC 41(b) provides that, unless the court in its order for dismissal otherwise specifies, the dismissal operates as an adjudication upon the merits, i.e., a dismissal *with prejudice.* But by its terms, RUSCFC 41(b) is limited to *involuntary* dismissals, and though the result more nearly approximates the result intended by the joint stipulation, RUSCFC 41(b) is inapplicable to the case before us.

The motion, then, functioned to amend the judgment to conform it to the court's July 11, 1991 order, and to the parties' joint stipulation, i.e., to provide that, subject to one exception, all of the Group's claims for the 1972–1975 taxable years were dismissed *with prejudice.*[11] The full text of the amended judgment reads:

> Pursuant to the court's order of September 1, 1992, granting the August 4, 1992, joint motion to amend judgment,
>
> IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the complaint is dismissed *with prejudice except that the complaint is dismissed without prejudice as to any adjustments to carrybacks from other taxable years.* (Emphasis added).

This was a significant substantive change to the rights of the parties under the order.[12] Thus, the motion is properly characterized as a RUSCFC 59(d) motion, and pursuant to Fed.R.App.P. 4(a)(4) (1992), the time to appeal did not begin to run until September 3, 1992. Accordingly, the Group's notice of appeal filed on September 22nd was timely filed, and this court has jurisdiction to entertain the appeal.

Our conclusion here is supported by the Advisory Committee Notes accompanying Fed.R.Civ.P. 59(e). There, it is stated that Rule 59(e) was added to care for a situation such as that arising in *Boaz v. Mutual Life Ins. Co. of New York,* 146 F.2d 321 (8th Cir.1944). That case involved a motion to amend a judgment (dismissing without prejudice the plaintiff's claims) to indicate that the claims were dismissed with prejudice.

It is also supported by *Willie v. Continental Oil Co.,* 746 F.2d 1041 (5th Cir.1984), *vacated and taken en banc,* 760 F.2d 87 (5th Cir.1985), *rev'd,* 784 F.2d 706 (5th Cir.1986) (*en banc*). That case involved a motion to

---

**11.** The exception relates to any portion of these claims which were based on carrybacks from other taxable years, i.e., other than 1972–1975.

**12.** The dissent's point—that the motion to amend was not substantive because it did not substantively impact any rights over which the court had jurisdiction—is incorrect. For one thing, the joint stipulation was only a stipulation for *partial* dismissal. Thus, the filing of that document was not effective in divesting under RUSCFC

41(a)(1)(B) the court of jurisdiction over any of the Group's claims. By its terms, RUSCFC 41(a)(1)(B) only applies to a stipulation dismissing of an entire *action.* For another, the July 21, 1992 judgment was issued in response to the joint stipulation agreed to by the parties, and thus is best characterized as a voluntary dismissal. Since a voluntary dismissal is without prejudice, *see* RUSCFC 41(a)(2), the motion proposed substantive changes in the rights of the parties.

amend a judgment to conform it to a pre-trial stipulation between the parties. The amendment related to the apportionment of damages between two co-defendants. The original panel concluded that the motion was a Fed.R.Civ.P. 60(b) motion and not a Fed. R.Civ.P. 59(e) motion. However, that decision was subsequently vacated and taken *en banc.* 760 F.2d 87 (5th Cir.1985). The *en banc* court concluded that the motion was in fact a Fed.R.Civ.P. 59(e) motion. 784 F.2d 706, 707 (5th Cir.1986).

The government disagrees with this characterization of the motion. Citing *BBCA, Inc. v. United States,* 954 F.2d 1429 (8th Cir.1992), and *St. Paul Fire, supra,* it argues that the motion merely sought to make explicit what had been implicit under applicable law, and thus is properly characterized as a RUSCFC 60(a) motion.

We are not persuaded. *BBCA* involved a motion which sought to amend a prior judgment dismissing the plaintiff's claims, to indicate that the dismissal was with prejudice. As here, the judgment was silent on the point. However, the fundamental difference between that case and the present is that, under applicable law, the judgment already amounted to a dismissal with prejudice.[13] The case is thus inapposite.

*St. Paul Fire* involved a document (whose status as a motion was questionable) which sought to incorporate into a judgment the essential terms of the court's underlying memorandum and order. The purpose apparently was to preclude a reading on appeal of the legal basis for the judgment broader than that set forth in the memorandum and order. 684 F.2d 691, 694. Unlike the motion in the present case, the document was unnecessary because the legal basis for the judgment was readily ascertainable from the record on appeal, which included the memorandum and order. *Id.* Thus, that case as well is inapposite.

For all the foregoing reasons, we conclude we have jurisdiction over the appeal.[14]

## 2.

■ The Group's principal argument on the merits is that the Court of Federal Claims erred in concluding, contrary to the parties' stipulation, that the letter of credit executed on July 2, 1984 in favor of the clerk of the court was not fully "collateralized." According to the Group, if the letter of credit is characterized consistently with the parties' stipulation, under the authority of *Chem Aero, Inc. v. United States,* 694 F.2d 196 (9th Cir.1982) the execution of that letter constitutes a transfer of money and property in satisfaction of a contested liability within the meaning of I.R.C. § 461(f) (1982) [15] (current version at I.R.C. § 461(f) (1988)) and the implementing regulation, Treas.Reg. § 1.461–2(c)(1) (1984) [16]. Thus, according to

13. The plaintiff's claims had been involuntarily dismissed for failure to cooperate in discovery. Under Fed.R.Civ.P. 41(b), the dismissal of these claims was with prejudice.

14. In view of our resolution of the jurisdictional issue on the ground that the joint motion to amend tolled the time for filing the appeal, we need not reach the Group's alternative argument that the time period was tolled due to "exceptional circumstances," i.e., its reliance on a notice in the amended judgment that the time to appeal was 60 days from the date of the amended judgment. Nor do we need to address the government's argument that the portion of the motion seeking to dismiss without prejudice the Group's claims in relation to adjustments to carrybacks from other taxable years was redundant in light of I.R.C. § 6511(d)(2)(B)(iii) (1988). Even if that were true, when considered in its totality the motion is substantive for the reasons noted *supra.*

15. That section reads in relevant part:

If—
　(1) the taxpayer contests an asserted liability,
　(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,
　(3) the contest with respect to the asserted liability exists after the time of the transfer, and
　(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year),
then the deduction shall be allowed for the taxable year of the transfer.

16. That regulation reads in relevant part:

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or property beyond his control ... (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the

the Group, the 1984 deduction was proper.[17]

The government, by contrast, argues that the character of the letter of credit is immaterial for purposes of this appeal. According to the government, even if the letter of credit is considered to have been fully collateralized, the Group would not be entitled to a deduction under I.R.C. § 461(f). That is so, argues the government, because the Group's liability to the fund did not become fixed but for the fact that the asserted liability was being contested, as required by the terms of the statute, until July 19, 1984, when Diamond's option to withdraw from the settlement agreement expired. By that time, however, I.R.C. § 461(h) had been enacted, and I.R.C. § 461(f) had been modified to indicate it was subject to the other. Under I.R.C. § 461(h), argues the government, the 1984 deduction was improper.

■ The government is correct. The general rule is that an accrual method taxpayer may not deduct an expense until satisfaction of the "all events" test has occurred. S.Rep. No. 830, 88th Cong., 2d Sess. 100 (1964), *reprinted in* 1964 U.S.C.C.A.N. 1673, 1773. Under the "all events" test, the taxpayer cannot deduct an expense until all the events have occurred that fix the amount and fact of the underlying liability. *United States v. Consolidated Edison Co.*, 366 U.S. 380, 385, 81 S.Ct. 1326, 1329, 6 L.Ed.2d 356 (1961) (citing *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347

(1926)). In the case of a contested liability, that cannot occur until the contest has been finally resolved. *Consolidated Edison*, 366 U.S. at 386–87, 81 S.Ct. at 1330–31.

I.R.C. § 461(f) was enacted in 1964 to allow a deduction prior to this time in the case of a taxpayer who transfers beyond his control money or property in satisfaction of the contested liability. S.Rep. No. 830, 88th Cong., 2d Sess., pt. 2, at 243 (1964), *reprinted in* 1964 U.S.C.C.A.N. 1673, 1913. However, by its terms, I.R.C. § 461(f) only allows for a deduction when "but for the fact that the asserted liability is contested", paragraph (4), § 461(f), a deduction would be allowed for the taxable year of the transfer, i.e., the "all events" test would be met. That requirement was not met here until July 19, 1984, when Diamond's option to withdraw from the settlement agreement expired.[18] By that time, however, I.R.C. § 461(h) had been enacted, and paragraph (4) of I.R.C. § 461(f) had been amended to indicate it was subject to I.R.C. § 461(h).[19] *See* Tax Reform Act of 1984, Pub.L. No. 98–369, § 91(a), 98 Stat. 494, 598–600 (1984) (codified at I.R.C. § 461(h) (1988))[20]. I.R.C. § 461(h) embodies an "economic performance" test, according to which an accrual method taxpayer may not deduct an expense prior to the time when "economic performance" occurs in relation to the expense. With respect to a tort liability, the statute defines economic performance as occurring when the payments are made as required by the liability of the taxpayer:

liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, ... or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest.... In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

17. Neither party independently addresses the question of the $85,200 deduction taken in 1985. Thus, we consider that deduction to stand or fall with the 1984 deduction.

18. We find unpersuasive the Group's argument that Diamond's option to withdraw from the settlement agreement effectively expired before

then because the number of plaintiffs that had opted out of the class was so small there was little chance that Diamond would exercise its option. The focus of the statute is the date when Diamond's liability became fixed as a matter of law but for the fact that the liability was being contested in the courts. That did not occur until July 19, 1984.

19. As amended, paragraph (4) of I.R.C. § 461(f) reads:

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year) *determined after application of subsection (h)*. (Emphasis added).

20. The effective date of the legislation was July 18, 1984.

**(1) In general**

For purposes of this title, in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs.

**(2) Time when economic performance occurs**

Except as provided in regulations prescribed by the Secretary, the time when economic performance occurs shall be determined under the following principles:

\* \* \* \* \* \*

**(C) [T]ort liabilities of the taxpayer**

If the liability of the taxpayer requires a payment to another person and ... arises out of any tort, economic performance occurs as the payments to such person are made.

Here, regardless of the character of the letter of credit, its execution in 1984 did not constitute a "payment" under the statute, i.e., that event did not constitute "economic performance" since no money or its equivalent was actually paid out to anyone.[21] Thus, we agree with the Court of Federal Claims that the 1984 deduction of $23,254,217 was improper.

**3.**

■ The Group next focuses on Diamond's January 14, 1985 cash payment of $23,339,417 to the fund. According to the Group, that payment entitles it to a deduction of the amount of the payment in 1985. The Court of Federal Claims, however, concluded that subsequent to July 18, 1984, in the case of a payment made in satisfaction of a tort liability, I.R.C. § 461(h) with one exception only allows for a deduction when the payment has been disbursed to the individual claimants; the sole exception being payments to a "designated" settlement fund as defined by I.R.C. § 468B (1988).[22]

■ According to the Group, this conclusion is in error because the January 14, 1985 payment satisfies the literal terms of I.R.C. § 461(h), and I.R.C. § 468B has no applicability to this case. The Group is correct. As we have said, absent extraordinary circumstances, the language of a statute, provided it is clear and fits the case, is conclusive. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579–80, 16 USPQ2d 1614, 1618 (Fed.Cir.1988), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991) (citing *Sullivan v. Stroop*, 496 U.S. 478, 482, 110 S.Ct. 2499, 2502–03, 110 L.Ed.2d 438 (1990); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988); *Bethesda Hospital Assoc. v. Bowen*, 485 U.S. 399, 403, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988)).

By January 14, 1985, the date of the payment in question, Diamond's liability to the individual claimants had been superseded by or merged with Diamond's liability to the settlement fund. This is established by the terms of the settlement agreement. According to ¶ 5:

Defendants ... are not, and in the future shall not be, subject to liability or expense of any kind to any member of the Class in

---

**21.** We find unpersuasive the Group's argument that the "payment" prescribed by I.R.C. § 461(h) occurred on July 20, 1984, the day when the execution of the letter of credit effectively became irrevocable. That event did not discharge Diamond's liability to the fund. Thus, it does not satisfy the statutory requirement.

**22.** I.R.C. § 468B provides in relevant part:

**(a) In general**
For purposes of section 461(h), economic performance shall be deemed to occur as qualified payments are made by the taxpayer to a designated settlement fund.

\* \* \* \* \* \*

**(d) Definitions**
For purposes of this section—
\* \* \* \* \* \*
**(2) Designated settlement fund**
The term "designated settlement fund" means any fund ... with respect to which an election is made under this section by the taxpayer.
An election under this section shall be made at such time and in such manner as the Secretary shall by regulation prescribe.

That section was enacted in 1986 with an effective date of July 18, 1984. *See* § 1881 of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2914 (1986). It is undisputed that Diamond did not timely make the election of designated status required under applicable law.

respect of any claim arising out of the subject matter of the Complaint, except as to their obligations to make payments pursuant to this Agreement. Claims against the Fund shall be the exclusive remedy of all Class members against the defendants ..., and all members of the Class are forever barred from instituting or maintaining any action against any of the defendants ... arising out of or relating to, or in the future arising out of or relating to, the subject matter of the Complaint.

Thus, the January 14, 1985 payment was made to the "person" required by Diamond's liability in accordance with the language of § 461(h).[23] Accordingly, the Group is correct that it is entitled to a deduction in 1985 of $23,339,417.

The Court of Federal Claim's conclusion, that I.R.C. § 468B defines the sole basis upon which a payment to a settlement fund in satisfaction of a liability is immediately deductible, is incorrect. By its terms, I.R.C. § 468B does not apply to "any contested liability of the taxpayer within the meaning of section 461(f)." See I.R.C. § 468B(e). Since the settlement in this case is of a contested liability within the express terms of § 461(f), the provisions of § 468B on their face are inapplicable.

The underlying tort liability of Diamond remained contested until 1988, because that is when the petition for certiorari to review the underlying fairness of the settlement agreement was denied. See Pinkney v. Dow Chem. Co., 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). This conclusion is supported by ¶ 13 of the settlement agreement which provides "[t]he settlement ... shall become effective only when the judgment ... dismissing ... plaintiffs' claims ... becomes final and is no longer subject to appeal or review." It is also consistent with the general rule that a contested tax liability is not final while an appeal of the underlying judgment is pending before a higher tribunal. See Richmond Hosiery Mills v. United States, 305 F.2d 840, 843–44 (Ct.Cl.1962); Lepman Bros. Co. v. Commissioner, 45

B.T.A. 793, 798 (1941); North Am. Coal Corp. v. Commissioner, 28 B.T.A. 807, 850–51 (1933); see also Consolidated Edison, 366 U.S. at 385, 81 S.Ct. at 1329–30.

The government argues that this interpretation of I.R.C. § 461(h) is incorrect in light of the following passage in the legislative history accompanying that section:

Since payment to a section 461(f) trust is not a payment to the claimant and does not discharge the taxpayer's liability to the claimant, such payment does not satisfy the economic performance test.

H.R.Conf.Rep. No. 98–861, 98th Cong., 2d Sess. 876 (1984), reprinted in 1984 U.S.C.C.A.N. 1445, 1564.

According to the government, Congress clearly had in mind the distinction between payment to a trustee and payment to the individual claimants, and thus did not intend to allow a deduction until payment to the individual claimants had occurred.

We cannot agree. The legislative history supports our interpretation of the statute. Prior to the enactment of I.R.C. § 461(h), Congress was concerned that under the rules then in effect, according to which an accrual method taxpayer was permitted to deduct expenses attributable to activities to be performed in the future, deductions were overstated through failure to take into account the time value of money. H.R.Conf.R. No. 98–861, 98th Cong., 2d Sess. 1254 (1984), reprinted in 1984 U.S.C.C.A.N. 697, 917. Congress enacted the "economic performance" test to take this factor into account. Id. Furthermore, the legislative history of I.R.C. § 468B evinces Congress' intention that negative inferences not be drawn from the enactment of that section about the tax treatment under the law then in effect of payments to a settlement fund in satisfaction of a *contested* liability. S.Rep. No. 99–313, 99th Cong., 2d Sess. 926 (1986), reprinted in 1986–3 C.B. (Vol. 3) at 926.

In the present case, the Group's liability was effectively discharged upon the January

---

**23.** The clerk of the court, as custodian of the fund, is a "person" pursuant to I.R.C.

§ 7701(a)(1) (1988).

14, 1985 payment to the fund of $23,339,417.[24] Thus, a conclusion that the payment is deductible does take account of the time value of money. The contrary conclusion—whereby the Group could not deduct the payment until it had been disbursed to the individual claimants—would ignore this factor; the Group would not be able to take a deduction even though its liability had effectively been discharged.

The passage cited by the government is not to the contrary. The type of trust referred to in that passage is distinguishable from the arrangement that is at issue in this case. In some cases the taxpayer's payment to a trust might not discharge that party's liability to the individual claimants under the trust, and thus would not constitute 'economic performance'. In the present case, in which Diamond's liability to the individual claimants was merged with or superseded by its liability to the fund, Diamond's payment to the fund did discharge its liability to the individual claimants, and thus did constitute 'economic performance'.[25]

## CONCLUSION

The decision of the Court of Federal Claims is *vacated* and the case is *remanded* for proceedings consistent with this opinion.

## COSTS

Costs in favor of the Group.

***VACATED AND REMANDED.***

MAYER, Circuit Judge, dissenting.

Because Maxus Energy Corporation and Subsidiaries (Maxus) did not file a timely notice of appeal, this court lacks jurisdiction.

---

**24.** The only challenge to the settlement agreement that was underway at the time was a challenge initiated by members of the plaintiff class.

**25.** A similar distinction relating to whether the individual claimants are parties to the written agreement establishing the trust is recognized in *Poirier & McLane Corp. v. Commissioner,* 547 F.2d 161 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977) and Treas.Reg. § 1.461–2(c)(ii) (1984).

On July 11, 1991, the United States Court of Federal Claims (CFC) issued an opinion granting partial summary judgment which disallowed Maxus' claimed income tax deductions. No. 4–89, Slip Op. (Ct.Fed.Cl. July 11, 1991) (July 11 opinion).[1] Subsequent to the CFC's opinion, but before final judgment was entered on all the claims, Maxus and the United States agreed to settle the remaining claims not subjects of the July 11 opinion. On June 30, 1992, Maxus and the United States filed a "Stipulation For Partial Dismissal" in the CFC. The stipulation states in its entirety:

> It is hereby stipulated and agreed that all claims alleged in the complaint for the recovery of a refund by plaintiffs, with the exception of those claims asserted by plaintiffs which were the subject of the July 11, 1991 opinion of this court, have been settled on a basis satisfactory to both parties, and accordingly may be dismissed with prejudice except that the claims are dismissed without prejudice as to any adjustments to carrybacks from other taxable years, the parties to bear their respective costs, including any possible attorney's fees or other expenses related to the litigation of the matters being dismissed.

The stipulation was signed by all parties to the suit. It is the filing of this stipulation and its effect that control jurisdiction.

The Federal Rules of Civil Procedure, and the corresponding rule of the CFC, give the parties the right to voluntarily dismiss a case by stipulation at any stage in the proceedings. Fed.R.Civ.P. 41(a)(1)(ii); RUSCC 41(a)(1)(B) (1991) (now RUSCFC 41(a)(1)(B) (1993)).[2] The stipulation filed by Maxus conforms to the rule. It is in writing, is signed by all parties involved and clearly states the parties' intention that the case is to be dis-

---

**1.** Maxus seeks to challenge the merits of this decision in this appeal.

**2.** The CFC rule provides, in relevant part:
> **(1) By Plaintiff; by Stipulation....** an action may be dismissed by the plaintiff *without order of court* ... (B) by filing a stipulation of dismissal signed by all the parties who have appeared in the action. *Unless otherwise stated in* the notice of dismissal or *stipulation,* the dismissal is without prejudice.... (Emphasis added).

missed. *See* 5 James W. Moore, et al., Moore's Federal Practice ¶ 41.02[2] (2d ed. 1994).[3] A stipulation of dismissal is effective immediately upon filing and no judicial approval is required. *In re Wolf,* 842 F.2d 464, 466 (D.C.Cir.1988). In addition, as is clear from the rule, the dismissal is without prejudice unless otherwise indicated in the stipulation. The stipulation here clearly provides that the dismissal is *with prejudice* except it is without prejudice as to the carrybacks. Thus the dismissal was effective and final as of June 30, 1992, the date it was filed in the CFC and the prejudice of the dismissal was as indicated in the stipulation itself.

The filing of a stipulation for dismissal deprives the court of jurisdiction over the matter stipulated. *See Kokkonen v. Guardian Life Insurance Company of America,* 511 U.S. ——, ——, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994) (the court may not even retain jurisdiction to enforce the settlement from which the stipulation derives unless that jurisdiction is expressly reserved with the consent of the parties). Because the CFC had no jurisdiction over the claims dismissed by the stipulation, the judgment entered by the court on July 21, 1992, had no effect on those claims. *See In the Matter of West Texas Marketing Corp.,* 12 F.3d 497, 501 (5th Cir.1994) ("when the parties voluntarily agreed to a dismissal, under Federal Rules of Civil Procedure 41(a)(1)(ii) ..., any

further actions by the court were superfluous. Therefore, the dismissal order entered by the bankruptcy court is rendered irrelevant to the question of the finality of the judgment." (Citations omitted)); *In re Wolf,* 842 F.2d at 466 (a judge is without authority to later alter a voluntary dismissal without prejudice to transform it into a dismissal with prejudice); *McCall–Bey v. Franzen,* 777 F.2d 1178, 1185 (7th Cir.1985) (if the parties' stipulation had been filed before the judge's order, that order would have been a nullity). However, the July 21, 1992 judgment did make final the partial summary judgment granted in favor of the United States pursuant to the CFC's July 11 opinion. This, and not the claims dismissed by stipulation, was the only substantive action affected. The merits of the summary judgment thus became final, and the time for filing a notice of appeal began to run, on July 21, 1992.

Pursuant to a motion filed by the parties on August 4, 1992, the court "amended" its July 21, 1992, judgment to conform to language used in the stipulation.[4] Because the CFC's actions could have no effect on the claims finally dismissed by the stipulation, this amendment had no substantive effect at all. *See Kokkonen* 511 U.S. at ——, 114 S.Ct. at 1675.[5] The amendment did not relate to the summary judgment issue and so had no effect there.[6] The amendment did

---

**3.** An oral stipulation made in open court may also be effective under the rule if the parties' agreement to the dismissal is clear. *See* Moore's at ¶ 41.02[2] n. 19.

**4.** The "Joint Motion to Amend Judgment" was clearly directed only to the claims that were the subject of the stipulation. The motion reads in its entirety:

Pursuant to RUSCC 60(a), the parties move to amend the July 21, 1992 judgment entered in the above-captioned case. The judgment states: "that the complaint is dismissed." The July 21, 1992 judgment does not indicate whether the complaint is dismissed with or without prejudice, and does not conform to the language contained in the parties' stipulation for partial dismissal. The parties respectfully submit that the lack of conformity between the July 21, 1992 judgment and the parties' stipulation was the result of an oversight or omission on the part of the Clerk. Pursuant to RUSCC 60(a), the July 21, 1992 judgment should be amended by adding immediately after the words "complaint is dismissed," the

additional words "with prejudice except that the complaint is dismissed without prejudice as to any adjustments to carrybacks from other taxable years."

As the motion focused only on the stipulated claims, and the claims subject to the July 11, 1991 opinion which were expressly excluded from the stipulation were not even mentioned by the parties' motion, or by the court in its amended judgment, the amendment was clearly not intended to, and did not affect those claims.

**5.** The Supreme Court recognizes that some circuits have held that a case dismissed by stipulation may be reopened by a party by reason of a breach of the agreement that was the basis for the dismissal by a motion under Fed.R.Civ.P. 60(b)(6). This exception to the general rule that the court lacks jurisdiction after stipulation obviously is not applicable in this case.

**6.** Even if the motion to amend and the amended judgment could somehow be interpreted as directed also to the claims that were the subject of

not have, and in fact could not have had, any substantive effect on the rights of the parties. Therefore, it did not extend the time for filing an appeal.

Because Maxus did not file a notice of appeal until September 22, 1992, one day after the expiration of the time limit, the notice was untimely and this court has no jurisdiction to reach the merits. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988) (the time limit for filing an appeal set out in Fed.R.App.P. 4(a)(1) is mandatory and jurisdictional).

the July 11 opinion, these claims were dismissed *involuntarily* in response to the government's motion for partial summary judgment. The government is therefore correct that Rule 41(b) applies, at least as to those claims, and an unspecified dismissal in those circumstances acts as a final adjudication on the merits, i.e. is *with prejudice*. The July 21, 1992 order thus acted as a dismissal with prejudice as to the only claims over which the court had jurisdiction and, if anything, the amended judgment was redundant as to those claims.